IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:07-HC-2192-H

GEORGE EARL GOODE, Jr.          )
                                )
            Petitioner,         )
                                )
    v.                          )        O R D E R
                                )
GERALD BRANKER,                 )
Warden, Central Prison,         )
Raleigh, N.C.,                  )
                                )
            Respondent.         )

        This matter is before the court on the petition for writ of
habeas corpus filed pursuant to 28 U.S.C. § 2254 on behalf of
George Earl Goode, Jr. ("Goode" or "petitioner"). Goode was
convicted of two counts of first-degree murder and sentenced to
death on each count. He seeks a writ of habeas corpus vacating his
convictions and alternatively, his death sentences. Respondent has
answered the petition and moved for summary judgment. Petitioner
has filed a reply to the answer and response to the motion for
summary judgment. In addition, the parties appeared before the
court on September 10, 2009, to present oral argument as to Claims
IV.B and IV.D. The matter is ripe for ruling.

                        STATEMENT OF THE CASE

        Goode was tried and convicted of the first-degree murders of
Leon and Margaret Batten, and robbery with a dangerous weapon of
Leon Batten at the November 1, 1993, criminal session of the

Superior Court of Harnett County.[1]  The following facts are summarized from the opinion of the Supreme Court of North Carolina. See State v. Goode, 341 N.C. 513, 461 S.E.2d 631 (1995).

A.  Facts

Glen Troublefield testified for the State at trial about the events surrounding the deaths of Leon and Margaret Batten. Troublefield testified that on February 29, 1992, petitioner, his brother, Chris Goode, and Eugene DeCastro, arrived at Glen Troublefield's apartment between 4 and 5 p.m.  A short time later, the four men left the apartment in a Nissan Maxima driven by petitioner to go to a club.

At approximately 6:20 p.m., the group drove past Leonard Wiggins on Kay Drive in Smithfield, North Carolina.  According to Mr. Wiggins' testimony at trial, petitioner stopped the car, got out and approached him.  Petitioner asked Wiggins, "Don't I know you?" and Wiggins said no.  Petitioner punched Wiggins, and with help from DeCastro stole Wiggins' jacket and a chain from around his neck.  Troublefield testified that when Petitioner and DeCastro returned to the car they were carrying a jacket and necklace.  He said that when petitioner started driving again he was driving erratically and ended up driving into a ditch.

After getting the car out of the ditch, petitioner drove the car to a store and the men bought wine.  Petitioner continued

---

[1] The charges originated in Johnston County, but Goode's motion for a change of venue was granted and the case was tried in Harnett County.

driving. He lost control of the car a second time and ended up in a ditch near the Dallas Mobile Home Park where his estranged wife had been living. Troublefield testified that when the car got stuck the second time he got out and started running in the opposite direction from the mobile home park.

James Adams testified at trial that on February 29, 1992, he was a resident of the Dallas Mobile Home Park. At about 7:15 p.m. he noticed a black man in a trailer that was not occupied and he notified the landlord, Leon Batten. As Mr. Batten approached the trailer Mr. Adams saw someone go inside and get something off the "eating table." Mr. Adams left and went home, but about ten minutes later went back to the trailer to see what was going on. He saw four black men beating Mr. Batten and heard Mr. Batten calling for help. Adams left to get help.

Levi Snead testified at trial that he arrived at the Dallas Mobile Home Park between 7:15 and 7:30 on the night of the murders. He saw three or four men around a person on the ground. Snead went to the Batten home to tell Mr. Batten. Mrs. Batten answered the door and said she thought Mr. Batten was already at the trailer park. Mr. Snead went to tell the police and Margaret Batten drove to the trailer park.

At trial, Detective Bass said he went to the Dallas Mobile Home Park around 7:33 p.m. on the night of the murders after receiving a call about a disturbance.[2] When he arrived, he saw

---

[2] Bass was a deputy at the time of the murders, but a detective at the time of trial.

petitioner and two other black men between a Toyota truck and Buick car in the yard of a trailer. As he exited his car, the men fled the scene. Detective Bass discovered Mr. and Mrs. Batten's bodies inside the bed of the Toyota truck. Mrs. Batten's shirt had been removed and she was bleeding heavily from her chest area.

At trial, the medical examiner testified that Margaret Batten suffered from at least twenty-three stab wounds and suffered six or seven broken ribs. The medical examiner also noted defensive wounds on the back of her hands. Mrs. Batten's cause of death was stab wounds to her chest and abdomen. The medical examiner testified that the autopsy of Mr. Batten revealed four stab wounds to the chest and back, puncture wounds, several broken ribs, and bruising about his head and face. Mr. Batten's cause of death was a stab wound to his left chest.

Lieutenant Reynolds testified that on the night of the murders he responded to Detective Bass' radio call for assistance at the trailer park. Detective Bass described the three men who had fled the scene. En route to the trailer park, Lieutenant Reynolds saw a black man walking quickly, looking back over his shoulder toward the trailer park. Lieutenant Reynolds stopped the man, later identified as petitioner. When petitioner refused to talk to Lieutenant Reynolds, Reynolds placed petitioner in the police car and took him to the trailer park. When petitioner was searched the police recovered Mr. Battens' wallet from petitioner's pocket.

At trial, the State introduced a Gerber knife found near the scene of the murders and asserted it was one of two knives used to

4

commit the crimes. Ralph Richardson, a former Marine and friend of petitioner's testified that in 1991 he had given petitioner a Gerber brand knife with an interchangeable blade. He testified he could not detect any differences between the knife he had given petitioner and the knife the police found at the crime scene.

Patrick Byrd was incarcerated in Johnston County jail at the same time as petitioner. At trial he testified about statements petitioner made to him in jail on December 22, 1992. Byrd testified petitioner told him that petitioner, DeCastro and Chris Goode were in petitioner's trailer drinking and smoking pot. Mr. Batten came to collect the rent because they were a couple of months behind, and petitioner thought he might be messing around with petitioner's wife. He said petitioner started "fussing" with Mr. Batten. DeCastro took Mr. Batten and hit him, and then petitioner pulled out a knife and started stabbing Mr. Batten. They took Mr. Batten and put him in the back of a truck. Around that time, Mrs. Batten pulled up. She started yelling and so the men grabbed her and "started messing with her."

Petitioner testified at trial. He said that on the date of the murders he and his brother were on the way to Johnston County when they saw DeCastro on the side of the road and picked him up. They arrived in Smithfield at about 5:30 p.m. and went to Glen Troublefield's apartment. He said that before arriving at Troublefield's apartment he had a few beers and while at the apartment he had a glass of gin. The men left the apartment and when they were near Kay Drive he saw someone he thought he knew.

5

He got out to speak to the man, but the man would not answer him, and petitioner punched him and grabbed his coat. Petitioner got back into the car and drove away. He lost control of the car and drove into a ditch. Petitioner's brother, DeCastro, and Troublefield walked to a nearby store while a friend helped petitioner get the car out of the ditch.

Once the car was out of the ditch, Petitioner went to the store and picked up his brother, DeCastro, and Troublefield. They went to a club, but soon decided to go to petitioner's trailer. On the way to the trailer petitioner again drove the car into a ditch. They could not get the car out and petitioner testified that all four men, including Troublefield, walked to petitioner's trailer. He said they started drinking at the trailer and he had a glass of wine. The men moved outside, and petitioner spoke with Deborah Atkins, a friend of his wife's who had driven up. A short time later, Leon Batten pulled up. Petitioner said that he told Mr. Batten he was going to move out, and he went inside the trailer to get his tape player.

Petitioner testified that while he was inside he heard Mr. Batten holler. He went back outside and saw his brother, DeCastro, and Troublefield beating Mr. Batten. He said he was scared and confused and turned to walk away. Petitioner said he refused to help move Mr. Batten's body, and about that time he noticed Glen Troublefield was not there. Mrs. Batten drove up and petitioner said that DeCastro started to stab her with some sort of butcher knife. He also saw his brother, Chris Goode, stabbing her. He

6

testified he crouched down and put his head in his hands. He testified he did not see, and does not know, who placed either body in the back of the pick-up truck where they were found. Petitioner testified he did not help move the bodies. He explained he did not help the victims or try to stop the attack because he was scared and just froze. Detective Bass drove up, and the three men fled. Petitioner saw the police car approaching, and he and Chris ran through the woods. He testified he was trying to protect his brother Chris so he told him where to go. He said that before they went separate ways Chris gave him a wallet. After he and his brother separated, a police officer stopped petitioner, patted him down, handcuffed him, and took him back to the trailer park.

B. Procedural History

After a trial by jury, petitioner was convicted of the first-degree murder of Leon Batten, the first-degree murder of Margaret Batten, and robbery with a dangerous weapon of Leon Batten. At the sentencing phase, the jury found three aggravating circumstances for the murder of Leon Batten: 1) the murder was especially heinous, atrocious, or cruel; 2) the murder was part of a course of conduct in which the defendant was engaged, including the commission of other crimes of violence against other persons; and, 3) the murder was committed while the defendant was engaged in the commission of robbery with a dangerous weapon. St. Ct. Rec. Vol. 15 of 45, Tab 1 at 78-79. The jury found two aggravating circumstances for the murder of Margaret Batten: 1) the murder was especially heinous, atrocious, or cruel; and, 2) the murder was

part of a course of conduct in which the defendant was engaged, including the commission of other crimes of violence against other persons. Id. at 84-85. For each murder the jury also found eight of the twenty mitigating circumstances submitted. Id. at 79-82, 85-88. On November 19, 1993, the jury recommended the death sentence for each count of first-degree murder, and the judge sentenced petitioner accordingly. The judge also sentenced petitioner to forty years imprisonment for the robbery conviction, the sentences to run consecutively.

On direct appeal, the Supreme Court of North Carolina affirmed petitioner's convictions and sentences. Goode, 341 N.C. at 553, 461 S.E.2d at 655. No appeal was taken to the United States Supreme Court.

Petitioner filed a motion for appropriate relief ("MAR")in Johnston County Superior Court on April 22, 1997. On May 13, 1997, petitioner filed an Amended MAR. On May 20, 1997, petitioner filed a Second Amendment to MAR. On June 5, 1997, petitioner filed a Third Amendment to MAR.

On June 27, 1997, the State filed a motion to strike the claim and allegations raised in Claim II.B in the Amended MAR in which petitioner asserted the State knowingly used false evidence about a phenolphthalein test reacting positively for the presence of blood. On June 30, 1997, petitioner filed a Fourth Amendment to MAR.

The State's motion to strike was heard before the Honorable Knox V. Jenkins, Jr. On July 2, 1997, Judge Jenkins granted the

8

State's motion to strike Claim II.B.

On July 7, petitioner filed a motion seeking to disqualify Judge Jenkins from further proceedings in the case. The motion was denied on October 23, 1998, but Judge Jenkins subsequently re-assigned the case to the Honorable Steve A. Balog, Special Superior Court Judge.

On July 27, 1998, petitioner filed a Fifth Amendment to MAR.

On March 11, 2002, the State filed its answer to petitioner's MAR and Amendments, and filed a motion to deny the MAR and Amendments on the pleadings.

On August 22, 2002, petitioner filed a Sixth Amendment to MAR.

On September 6, 2002, Judge Balog heard arguments from the parties as to whether an evidentiary hearing was needed on petitioner's claims. On November 27, 2002, the court filed an order denying in part petitioner's MAR and Amendments (hereinafter "Nov. 2002 MAR Order").[3] The order denied Claims I(A), I(B), I(C)), I(I), I(K), I(M), III(A), and III(B).

On March 23, 2004, the State filed an answer and supporting appendix responding to petitioner's Claim IV of the Sixth Amendment to MAR and moved to deny the claim on the pleadings.

An evidentiary hearing was held before Judge Balog on the remaining MAR claims on April 26-29, 2004; June 1-4, 2004, and September 13-17, 2004.

On May 7, 2004, petitioner filed a motion entitled New Motion

_____

[3] The order is located in St. Ct. Rec. Vol. 40 of 45 at Tab 2.

for Appropriate Relief based on newly discovered evidence, or in the alternative, amendment to defendant's MAR. On May 25, 2004, the State filed an answer to the new motion for appropriate relief, and on June 1, 2004, the State filed a supplemental answer to the MAR and Amendments.

On September 17, 2004, at the conclusion of the evidentiary hearing, Judge Balog announced from the bench that Goode's remaining MAR claims would be denied and directed the State to draft a proposed order. Petitioner was given an opportunity to file a response to the proposed order. On December 15, 2004, Judge Balog filed the order denying petitioner's remaining claims raised in his MAR and Amendments (hereinafter "Dec. 2004 MAR order").[4] On November 30, 2005, petitioner filed a motion in Johnston County Superior Court requesting reconsideration of the Dec. 2004 MAR order.

On February 9, 2006, petitioner filed a petition for writ of certiorari with the Supreme Court of North Carolina. The Supreme Court of North Carolina denied Goode's petition for writ of certiorari.

On June 23, 2006, Judge Balog filed an order denying petitioner's motion to reconsider the Dec. 2004 MAR order.

On October 11, 2007, the Supreme Court of North Carolina denied Goode's petition for writ of certiorari. State v. Goode, 361 N.C. 698, 652 S.E.2d 924 (2007).

---

[4] The order is located in St. Ct. Rec. Vol. 40 of 45 at Tab 3.

On October 12, 2007, petitioner filed a petition for writ of habeas corpus with this court. On March 7, 2008, respondent filed an answer to the petition and a motion for summary judgment. Petitioner has responded and the matter is ripe for ruling.

DISCUSSION

A. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

Because Goode's petition was filed after April 24, 1996, review of his petition is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). See Williams v. Taylor, 529 U.S. 420, 429 (2000); Mickens v. Taylor, 240 F.3d 348, 355 (4th Cir. 2001). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by

the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams, 529 U.S. at 412. A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. "In assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether the [decision was] well reasoned." Wilson v. Ozmint, 352 F.3d 847, 855 (4th Cir. 2003).

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence

may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 690 (4th Cir. 2001). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000). If, however, the state court failed to adjudicate a properly presented claim, the federal court must review questions of law and mixed questions of law and fact *de novo*. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000). Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Id.

B.   Goode's Claims

    Claim I - The State unconstitutionally misled the jury by presenting evidence and argument that it found blood on petitioner's boot;

    Claim II - The State withheld material exculpatory evidence;

    Claim III - Petitioner received ineffective assistance of counsel at trial related to jury selection;

    Claim IV - Petitioner received ineffective assistance of counsel because counsel failed to adequately prepare to meet the State's evidence and failed to present available psychiatric evidence;

    Claim V - Petitioner received ineffective assistance of counsel at the penalty phase of trial because counsel failed to adequately investigate and present mitigating evidence;

    Claim VI - The trial court erred by ruling that co-defendant

DeCastro's criminal record was not relevant evidence at sentencing.

Petitioner contends he is entitled to relief from his convictions and sentences of death because of these alleged constitutional violations.

C.   Discussion

In accordance with 28 U.S.C. § 2254(d), this court must determine whether the state court's adjudication of petitioner's claims was contrary to, or involved an unreasonable application of, clearly established federal law.[5]

   1.   Claim I - The State unconstitutionally misled the jury by presenting evidence and argument it found blood on petitioner's boot

In Claim I, petitioner argues his convictions are unconstitutional because the State misled the jury and presented false evidence in violation of Napue v. Illinois, 360 U.S. 264

_____

[5] Petitioner contends in the petition that:

   This Court should not defer to the findings and
   conclusions of the state court in this case because the
   proceedings were marred with unfairness.    28 U.S.C.
   2254(d)(6) (federal court will only defer to results of
   a state court proceeding that was 'full, fair and
   adequate').

Petition at 17.  This argument, based on  subsection 2254(d)(6)
and the "full, fair, and adequate" language cannot succeed.   The
version of 28 U.S.C. § 2254 to which petitioner is citing was
superseded by AEDPA.   The current version of section 2254 no
longer contains language requiring the federal habeas courts to
first evaluate the fair or adequate nature of state court
proceedings before applying the deferential standard on review.
See Lambert v. Blackwell, 387 F.3d 210, 237038 (3rd Cir. 2004).
Rather, under AEDPA, the court is to apply the deferential
standard of 28 U.S.C. § 2254 to state court rulings simply as
long as the issue was adjudicated on the merits by the state
courts.   Id.

(1959) and Giglio v. United States, 405 U.S. 150 (1972). The claim centers on the State's evidence presented by Special Agent Duane Deaver, a serologist at the State Bureau of Investigation crime laboratory in Raleigh.[6] Petitioner's trial started on November 1, 1993, and on the afternoon of November 8, 1993, the State for the first time presented the defense with a report, also dated November 8th, that had been prepared by Agent Deaver.[7] Prior to Agent Deaver's report, there was no evidence of blood on the clothing or boots petitioner was wearing at the time the murders occurred.[8] However, Agent Deaver's report stated petitioner's left boot, labeled item #31 in the report and State's exhibit #115 at trial, tested positive for the presence of blood. The report provides in pertinent part, "Results of Analysis: Examination of Item #31 gave chemical indications for the presence of blood. The quantity of the stain was insufficient to test further. Examination of Items #32a, #32b, #32c, and #32d failed to reveal any visible bloodstains."[9] Petition, Exhibit 5 at 2. At trial, Agent Deaver

---

[6] Agent Deaver was tendered and accepted as an expert in the fields of forensic serology and blood stain pattern interpretation. St. Ct. Rec. Vol. 11 of 45 at 74, 83.

[7] The defense moved to suppress the evidence on the basis of the late production, but lost the motion. St. Ct. Rec. Vol. 11 of 45 at 21-22.

[8] Agent Deaver testified he was given items belonging to the alleged perpetrators on October 27, 1993, and asked to examine the items for the presence of blood and type of blood stains. Earlier analysis by Agent Bissett, a serologist at the S.B.I. crime laboratory had found no blood on petitioner's clothing.

[9] Items #32a, #32b, #32c, and #32d are petitioner's sweat pants, overalls, boxers, and that were all tested by Agent

15

similarly testified the top of petitioner's left boot tested positive for the presence of blood. He testified there was no visible stain on the boot, but when he did a chemical test "[i]t was positive for the presence of blood." St. Ct. Rec. Vol. 11 of 45 at 91. On cross-examination he acknowledged he could not determine whether the blood was human or animal or how long it had been on the boot. Id. at 99-100.

Petitioner argues the State misled the jury and presented false evidence because, in fact, Agent Deaver never tested for blood. Petitioner asserts that during state post-conviction proceedings he learned for the first time that Agent Deaver's determination was based only on the result of a phenolphthalein test which is a only a preliminary test and not a conclusive test for blood. Petitioner argues his defense has always been that while he was present at the trailer park, he did not participate in the stabbings and was far enough away from the attack that he did not get blood on him. Petition at 20. He testified at trial that he was inside his trailer retrieving items at the time the attack started and when he walked out onto the steps and saw what was happening he froze. Therefore, he argues that the presence or absence of blood on him was a central issue in the case and Agent Deaver's false and misleading evidence and testimony was highly prejudicial.

## Factual Background

Deaver.

During State post-conviction proceedings, petitioner first raised his argument that the State knowingly used false evidence as a result of Agent Deaver's testimony in his amendment to MAR as Claim II(B). In response, the State filed a motion to strike the claim arguing it was baseless in law and fact. It argued "[s]uch baseless allegations, impugning the integrity of public officials and dedicated public servants, have no legitimate place in a court of law." St. Ct. Rec. Vol. 17 of 45, Tab 1, Motion to Strike at 8. In an order entered on July 7, 1997, the court noting the "impeccable reputations" of District Attorney Tom Lock and Assistant District Attorney Michael Beam, granted the motion to strike and forwarded the matter to the disciplinary committee of the North Carolina State Bar for any action it deemed proper. St. Ct. Rec. Vol. 40 of 45, Tab 1. The State Bar concluded no misconduct had occurred. Petition, Exh. 2.

Subsequently, petitioner re-framed the arguments in Claim II(D) in the Fifth Amendment to MAR. As part of that claim, petitioner re-asserted the argument first made in Claim II(B) that Agent Deaver falsely and misleadingly testified petitioner's boot testified positive for the presence of blood based only on a phenolphthalein test.

An evidentiary hearing was held on Claim II(D) and other claims raised in petitioner's MAR and amendments on April 26-29, 2004; June 1-4, 2004; and September 13-17, 2004. Just prior to the start of the hearing, on April 16, 2004, the State sought leave to perform DNA testing on petitioner's boots and coveralls worn at the

17

time of the offenses. Petitioner objected to the State's motion to test the evidence arguing: 1)DNA testing 12 years after trial was irrelevant to the issue of whether Agent Deaver misrepresented his testing before trial; 2) the evidence had been stored improperly and the quality compromised since the time of trial so as to make any results unreliable; and, 3) DNA testing would not indicate whether blood had been on petitioner's left boot. The State prevailed and for the first time tested petitioner's boots and coveralls for the presence of victim DNA capillary electrophoresis. Based on the DNA testing, the experts for the State concluded victim DNA was found on petitioner's coveralls and the bottom of his boot.[10] At the evidentiary hearing, the State argued the presence of this victim DNA "confirmed" Agent Deaver's trial testimony that there was blood on the top of petitioner's boot.

At the conclusion of the hearing, the MAR court ruled from the bench that petitioner's remaining MAR claims were denied. It ordered the State to prepare an order for the court and directed the State to make two sets of findings with respect to petitioner's claim that Agent Deaver had falsely testified at trial, one excluding the new DNA evidence and one taking the new DNA evidence into account.

## MAR Court's Ruling

In denying petitioner's claim without relying on the new DNA evidence, the MAR court found that petitioner failed to show Agent

---

[10] At trial, Agent Deaver testified the top of petitioner's left boot had tested positive for the presence of blood.

Deaver's testimony was false or created a false impression. Dec. 2004 MAR Order at 82, 85. The MAR court held "Agent Deaver did not testify that, in fact, the substance was blood." Id. at 82. The court reasoned the cross-examination of Agent Deaver by defense counsel, during which it was elicited that Deaver could not determine whether the blood was human or animal or when it was deposited, made the jury aware of the limitations of the testing conducted by Agent Deaver. Id. at 85-86.

The court further reasoned there was "no evidence or basis for Goode's suggestion that the prosecutors and the State knowingly used such allegedly false evidence by Agent Deaver to obtain Goode's convictions and death sentences. The order reasoned that the prosecutors did not elicit from Agent Deaver a portrayal of the chemical test as conclusive. The evidence was presented truthfully and accurately for what it was - a positive indication for the presence of blood - no more and no less." Id. at 86. The order further stated that Agent Deaver's report mentioned the boots were chemically tested for the presence of blood and "it is common knowledge that the chemical test usually used by investigators in such circumstances is the phenolphthalein test." Id. at 87. The order also found there was no evidence the State or Agent Deaver "intentionally sought to conceal or hide the identity of this chemical test from anyone . . ." Id. at 87. Finally, the order found, there was not a reasonable probability the bench notes and Agent Deaver's findings would have produced a different verdict. Id. at 87.

<u>Analysis</u>

Petitioner asserts the MAR court's ruling is based upon an unreasonable determination of the facts. Insofar as the MAR court ruled without relying on the 2004 DNA evidence, petitioner argues the MAR court unreasonably determined that Agent Deaver did not testify he found blood on petitioner's boot. Petitioner, citing to Agent Deaver's trial testimony, argues Agent Deaver repeatedly described the substance on petitioner's boot as blood and the State clearly created the impression that he had found blood on the boot. He argues that based on Agent Deaver's testimony at trial, it is unreasonable to conclude otherwise. Moreover, he asserts the issue depends on whether Agent Deaver's testimony created the false impression for the jury that he found blood on petitioner's boot, not whether he used the exact phrase "I found blood" versus the phrase that the boot tested "positive for the presence of blood."

In response, Respondent argues petitioner is unable to clearly rebut the factual determination of the MAR court that Agent Deaver never falsely testified he found blood on petitioner's boot. Respondent does not disagree over the nature of the phenolphthalein test, but argues that Agent Deaver never testified the test was conclusive.[11] Respondent asserts the MAR court correctly found that

_____

[11] All the expert testimony on both sides indicates a phenolphtalein test is not a conclusive test for blood, but is merely a presumptive or screening test. Agent Deaver testified at the post-conviction hearing that a phenolphthalein test cannot establish a substance is blood. St. Ct. Rec. Vol. 25 of 45 at 1061. He explained that the phenolphthalein test is a presumptive or screening test. <u>Id.</u> at 1055. He explained it is a test for an enzyme contained in blood, but also contained in

Agent Deaver never portrayed the chemical test he conducted as a conclusive test that the substance on petitioner's boot was blood, but testified truthfully there was a positive chemical indication for the presence of blood.

The State's use of false evidence against a defendant violates the Fourteenth Amendment. Napue, 360 U.S. at 269. The violation occurs when the State intentionally relies upon such evidence and also when the State has not deliberately introduced the false evidence, but fails to correct it after it is introduced. Id. False testimony or evidence introduced by a law enforcement officer is imputed to the State. Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998). A defendant convicted with use of false evidence is not automatically entitled to a new trial. A new trial is warranted only when there is a reasonable likelihood the false evidence could have affected the verdict. Napue, 360 U.S. at 271; Boyd, 147 F.3d at 330.

At the start of his trial testimony, Agent Deaver was asked by

_____

radishes, tomatoes, other vegetables, bacteria. Id. at 1154. Similarly, Special Agent Honeycutt, who was called by the State during post-conviction proceedings, testified the phenolphthalein test is a "preliminary test" for the presence of blood and that phenolphthalein can give a positive reaction to things other than blood. St. Ct. Rec. Vol. 28 of 45 at 1498, 1513. Dr. Marilyn Miller, an expert in forensic serology called by petitioner at the post-conviction hearing also testified the phenolphthalein test is only a screening test. Id. at 1222, 1227-28. She testified she has never said something is blood based only on the phenolphthalein test because there are too many non-blood substances which can give a positive result, including chemical substances and fruit and vegetable substances. Id. at 1229. She also testified she had seen tests in which a positive result was later determined not to be blood after a confirmatory test was done. Id. at 1230.

21

the prosecutor to describe his objective in examining the various items he had been given by the State, including petitioner's boot. He testified in pertinent part:

> What would normally be the case if I looked at the items the first time, I would first identify them to make sure that blood was present. That had already been done on all the items except one which was State's Exhibit Number 115, a pair of boots. Those had not been analyzed by anyone in the laboratory for the presence of blood previously, so I took the boots out of the bag and looked at them for visual blood stains. In other words, with my eyes. I could not see any. I then did a test for the presence of blood on those boots. In other words, what I did was I took a filter paper, little round piece of cotton paper and wiped the boots down and applied chemicals to see if there was invisible – if there was an invisible blood stain present.

St. Ct. Rec. Vol. 11 of 45 at 88-89.

When asked by the prosecutor to give the results of his analysis Agent Deaver testified:

> The first thing that I actually looked at were the boots. There was no visible stain present on the boots. Stains I could see with my eyes. I did, however, achieve a result when I did a chemical test for that. It was positive for the presence of blood. I could not tell where the blood was because I couldn't see it. I was testing for an invisible amount of blood. The quantity of which I could not test further, beyond that test.

Id. at 91.

Notably, in this initial discussion of what his testing revealed, after testifying that the chemical test was "positive for the presence of blood," he then twice referred to the substance unconditionally as blood in describing limitations on further testing.

Subsequently, on cross-examination Agent Deaver indicated that he did two separate test on the boots, one on the surface and one

on the soles. Id. at 99. Defense counsel continued the questioning:

> Q: And on the bottom you determined that you found the presence of no blood. Is that correct?
>
> A: On the bottom of both boots, that's correct.
>
> Q: All right. And also on the top of the boots there you found nothing that you could determine was human blood, didn't you?
>
> A: That's correct.
>
> Q: Could have been cow blood?
>
> A: Well, yes.
>
> Q: Could have been the Defendant's blood?
>
> A: Could have been.
>
> Q: They were combat boots weren't they?
>
> A: In my opinion, I've not been a soldier, but they were military style.
>
> Q: Do you know whether or not the substance that you say was some form of blood got on his boots in the United States or Saudi Arabia?
>
> A: No, I do not.
>
> Q: You don't know how long it had been on there?
>
> A: No, sir.
>
> Q: And you don't even know whether or not it was human blood?
>
> A: No, I do not.
>
> Q: Can you show the jury where the blood was located on those boots?
>
> A: I can show - what I do is I take areas because I can't see it I need to be able to tell a jury fairly closely where it was. And the area of these boots that it came from was the top - leather portion of the top of the left boot.

Q: But of course, it was not visible to the human eye?

A: No.  That's true.

Id. at 99-100.

Later on cross-examination, Agent Deaver affirmed that no blood was found on any of the other items he tested that were identified as belonging to petitioner.  Id. at 104-06.

The court finds the MAR court's determination that Agent Deaver's testimony did not portray the chemical test as conclusive for blood and did not create a false impression is based upon an unreasonable determination of the facts.  As noted above, a state court's factual determinations are presumed correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1). This deferential standard, however, does not "imply abandonment or abdication of judicial review."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A review of the trial transcript indicates Agent Deaver's original explanation of his examination and testing of the boot, and his response to additional questions by the prosecutor clearly created the impression blood was found on the top of petitioner's boot.  While Agent Deaver at times used the phrase "positive for the presence of blood," at other points he simply referred to the substance he found as "blood" or agreed with the attorneys' characterization of the substance as blood without clarifying the limits of the test.

For example, in describing his testing of the boot, after saying the chemical test was positive for the presence of blood he

continued "I could not tell where the blood was because I couldn't see it. I was testing for an invisible amount of blood. The quantity of which I could not test further, beyond that test." Vol. 11 of 45 at 91. When asked by defense counsel, who accepted Agent Deaver's testimony he had achieved a positive result for blood, "Can you show the jury where the blood was located on those boots?", Agent Deaver replied, ". . . because I can't see it I need to be able to tell a jury fairly closely where it was. And the areas of these boots that it came from was the top - leather portion of the top of the left boot." Id. at 100.

While Agent Deaver may not have used the specific words he "found blood" on the boot, his testimony falsely portrayed to the jury that he conducted a test for blood which indicated blood, not some substance which might be blood, was on petitioner's boot. At no time during trial or in the report given to the defense at the time of trial did Agent Deaver name the test he conducted or explain that the test he had used was only a screening test. He never qualified or clarified his testimony to correctly describe the limitations of the test or its results. Further, the prosecutor reinforced the misleading testimony by arguing during closing in listing the evidence of petitioner's guilt for the jury to "think about the blood on the boots." St. Ct. Rec. Vol. 12 of 45 at 193. And whether or not the prosecutors were aware Agent Deaver's test was only presumptive, his misleading testimony is

imputed to the State. See Boyd, 147 F.3d at 329.[12]

The MAR court's determination is also unreasonable insofar as it found the defense elicited that Agent Deaver's test was only presumptive, not conclusive, for blood. On cross-examination defense counsel elicited some limitations in the testing done by Agent Deaver. However, contrary to the MAR court's determination, the cross-examination reinforced the impression that blood, of some form, was present on the boot. During the cross-examination counsel referred to the substance as "blood," and showed that Agent Deaver was unable to determine what type of "blood" was present on the boot and when or where the "blood" was deposited. This line of questioning, while attacking what type of blood was found or when it was deposited, again indicated to the jury that blood of some type was found on petitioner's boot.

In reaching its ruling, the MAR court also reasoned "it is common knowledge that the chemical test usually used by investigators in such circumstances is the phenolphthalein test." Id. at 87. However, there is no evidence or indication in the record that at the time of trial such common knowledge existed in the community.

Accordingly, the MAR court's denial of petitioner's claim that the State, through Agent Deaver, presented false and misleading

_____

[12] Agent Deaver was a Special Agent with the North Carolina State Bureau of Investigation. St. Ct. Rec. Vol. 11 of 45 at 70. Agent Deaver's post-conviction affidavit says he does not know what the prosecutors knew about his testing, but they had questioned him about phenolphthalein testing in previous trials.

26

evidence was based upon an unreasonable determination of the facts. A reasonable consideration of the record demonstrates the State, through Agent Deaver, presented misleading evidence about the testing done on petitioner's boots being conclusive for the presence of blood.

However, to be entitled to a new trial, petitioner must also show there is a reasonable likelihood the false evidence could have affected the verdict. Napue, 360 U.S. at 271; Boyd, 147 F.3d at 330. Since the MAR court concluded the evidence presented by Agent Deaver was not false or misleading, it did not reach the second prong of the analysis. Therefore, the court must consider the issue de novo. See Rompilla v. Beard, 545 U.S. 374, 390 (2005).

Petitioner contends the misleading evidence had a material effect at both the guilt and penalty phases of his trial. Petitioner's defense at trial was that while he was present at the scene of the murders, he did not participate in the stabbings and remained far enough away not to get blood on him. He argues that without Agent Deaver's misleading testimony, counsel could have made the "powerful argument" that in contrast to the victims and his co-defendants who had substantial amounts of blood on them, petitioner did not have any blood of any kind on him. Petitioner contends, that in the face of the misleading evidence, he was denied this persuasive argument and the defense could only make the weak argument that the blood could have gotten on the boot at some other time or come from another source.

The court concludes there is not a reasonable likelihood of a

different outcome at trial if the misleading evidence about the blood found on petitioner's boot was not admitted. When the evidence was introduced at trial, it was elicited that the amount was so small it was invisible to the eye, it could not be determined if it was even human blood, and it could not be determined when or where the blood was deposited on the boots. The jury also heard evidence indicating this "invisible" amount of blood on petitioner's boot was the only blood on his person, in contrast to significant amounts easily seen on the clothing of Chris Goode and Eugene DeCastro.[13] At trial, the State presented evidence against petitioner including that he was found with Mr. Batten's wallet, carried a Gerber knife like one found near the scene, and had admitted and bragged of his involvement to Patrick Byrd.[14] Given the evidence against petitioner, if Agent Deaver's testimony about a microscopic amount of unidentified blood found on petitioner's boots had been omitted at trial, there is not a

---

[13] Glen Troublefield's clothing was apparently never tested for blood. The fact he was taken into custody shortly after the crimes but never charged in the offense suggests he may not have had blood visible on his clothing or person, but it is not evident from the record.

[14] Petitioner argues about the unreliability of Patrick Byrd's testimony. Petitioner argues Patrick Byrd was not credible given that Byrd was friends with Glen Troublefield and had his bond lowered to an amount allowing him to be released from jail shortly after telling the police about petitioner's inculpatory statements. He also argues Byrd's account is not credible because it was inconsistent with the physical evidence to the extent he said the attack started inside the trailer.

The defense raised all of these issues at trial. The jury had an opportunity to consider these issues in assessing Mr. Byrd's credibility and the weight to place on his testimony.

28

reasonable likelihood the jury would have reached a different outcome.[15]

Moreover, petitioner testified he was at the scene and placed himself not far from where the murders occurred and also placed himself around his brother Chris Goode as they fled. Under these circumstances a single microscopic spot of blood on his boot is not wholly inconsistent with his account. Finally, the State reminded the jury during closing argument that although Mrs. Batten had the more violent death with twenty-three stab wounds and her blood was found on the ground, her blood could not be positively identified on the clothing of any of the perpetrators. St. Ct. Rec. Vol. 12 of 45 at 122.

As noted above, the MAR court also provided alternative reasoning for the denial of petitioner's claim relying upon DNA evidence first developed and introduced during post-conviction proceedings.[16] As this court has found that petitioner cannot

---

[15] Notably, at the penalty phase, the jury rejected the mitigating factor for both murders that the "murder was actually committed by another person and the defendant was only an accomplice in or accessory to the murder and his participation in the murder was relatively minor. See St. Ct. Rec. Vol. 15 of 45, Tab 1 at 80, 85.

[16] Essentially, the State presented evidence at the post-conviction hearing indicating a DNA test done on petitioner's coveralls in 2004 revealed DNA material that was a mixture of DNA from multiple sources and Mr. and Mrs. Batten could not be excluded as the sources. The State also presented evidence that DNA found on the bottom of petitioner's left boot in 2004 matched the DNA standard for Mr. Batten. The State argued to the MAR court that this DNA evidence showed that Agent Deaver's testimony that blood was found on the top of petitioner's boot was not false or misleading.

Petitioner makes persuasive arguments that the DNA evidence

29

succeed on his claim for the reasons discussed above, there is no need for the court to address the MAR court's alternative reasoning denying petitioner's claim relying on the DNA evidence.

Lastly, the court notes that petitioner has asked for an evidentiary hearing of this claim. A federal habeas court must allow an evidentiary hearing only where a factual dispute, if resolved in petitioner's favor, would entitle him to relief and the state court has not afforded the petitioner a full and fair evidentiary hearing. Rector v. Johnson, 120 F.3d 551, 562-63 (5th Cir. 1997) (internal citations and quotations omitted, emphasis in original). Petitioner cannot show a factual dispute that if resolved in his favor would entitle him to relief.

Accordingly, for the reasons discussed, respondent's motion for summary judgment as to Claim I is granted.

### 2. The State withheld material exculpatory evidence

In Claim II, petitioner argues the State's suppression of the fact Agent Deaver only performed a phenolphthalein test violated the prohibition against the government withholding material exculpatory evidence. In support, petitioner cites to Strickler v. Green, 527 U.S. 263 (1999).

first discovered in 2004 cannot substantiate or corroborate Agent Deaver's blood evidence in 1993. He notes that the 1993 spot was purportedly on the top of his left boot, but the DNA evidence was found on the bottom of a boot and his coveralls. He also argues the evidence was highly unreliable because of contamination. He presents information and expert testimony showing that the exhibits were used and moved during multiple trials and had been stored and handled in a manner that would have allowed for contamination and transfer of DNA material.

30

The argument was raised as part of Claim II.D of the MAR and was intertwined with petitioner's arguments that the State presented false or misleading evidence.[17] In raising Claim II.D., petitioner argued there was a pattern of suppression of information contradicting the findings to which Agent Deaver testified at trial. Fifth Am. to MAR at 21-22. Although most of the argument focused on the blood spatter evidence on the clothes of the victims and co-defendants, petitioner argued Agent Deaver's case notes, which the defense did not have at the time of trial, revealed that Agent Deaver conducted a phenolphthalein test on petitioner's boot. Petitioner noted the case notes also indicate the swab revealed only a "very slight" reaction to the phenolphtalein test and there was not a sufficient quantity of substance on the boot to perform a Takayama test, which is a conclusive test for the presence of blood.

The MAR court denied Claim II.D on the merits. The MAR court reasoned it was brought out at trial that Agent Deaver's test only indicated the presence of blood and did not give a false impression and the "prosecutors did not elicit from Agent Deaver a portrayal of the chemical test as conclusive." Dec. 2004 MAR Order at 82, 85-86. Citing to Strickler, 527 U.S. at 281, the court held the alleged non-disclosure of Agent Deaver's notes and findings "was not so serious" that there was a reasonable probability of a

_____

[17] Both petitioner and respondent state this claim was raised as part of Claim II.D. of the MAR and denied on the merits by the MAR court.

different outcome at trial.  Dec. 2004 MAR Order at 87.

Petitioner, as he did in Claim I, argues that the MAR court's factual determinations that the jury was not misled about the nature of Agent Deaver's testing and that it was "common knowledge" a phenolphthalein test was used are unreasonable in light of the record.  For the reasons discussed pursuant to Claim I, supra, the court concludes the MAR court's findings that Agent Deaver's testimony did not give a false impression and that the type of testing done was common knowledge are based on an unreasonable determination of the facts.  However, in a habeas proceeding, even if the state court's ruling was based upon an unreasonable determination of the facts or an unreasonable application of clearly established federal law, a petitioner is only entitled to relief if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Stephens v. Branker, 70 F.3d 198, 207 (4th Cir. 2009) (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Consequently, the arguments in Claim II of the petition will be considered by the court to determine if petitioner can show he is entitled to relief.

To succeed on a claim the State withheld material exculpatory evidence, a defendant must show evidence was suppressed by the State; the evidence was favorable to the defense; and the evidence was material to guilt or punishment.  Strickler, 527 U.S. at 281-82.  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v.

Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

Even if the State improperly withheld Agent Deaver's report and information that Agent Deaver only performed a phenolphthalein test, petitioner cannot show he is entitled to relief on this claim. Petitioner is unable to show a reasonable probability that the result of the proceeding would have been different had the information been disclosed to the defense.

As in Claim I, petitioner argues that "had the jury known the State never tested petitioner's boot for blood it would probably have accepted his testimony that he did not participate in the stabbings." Petition at 53. He argues the jury would have acquitted him of the murders, or at the least, not sentenced him to death. Id. However, for the same reasons the court concluded petitioner was unable to show a reasonable likelihood of a different outcome in its discussion of Claim I, petitioner is unable to show a reasonable probability of a different outcome at trial had the State disclosed to the defense prior to trial that Agent Deaver had only performed a presumptive, not conclusive, test for blood on petitioner's boot. As discussed, when all of the evidence implicating petitioner is considered, as well as the fact the jury heard the only blood on petitioner was an amount not visible to the naked eye, which could not be identified as human,

33

and which Agent Deaver could not determine when or where it had been deposited, petitioner is unable to show a reasonable likelihood of a different outcome at either phase of trial if the defense had the information about Agent Deaver's testing.

Accordingly, petitioner cannot show he is entitled to relief on this claim. Respondent's motion for summary judgment as to Claim II is granted.

### 3. Claim III - Petitioner received ineffective assistance of counsel at trial related to jury selection

In Claim III, petitioner argues he received ineffective assistance of counsel during jury selection. Petitioner argues counsel were ineffective because they failed to challenge jurors who expressed the death penalty was the appropriate punishment in the case of two murders. Petitioner also contends counsel were ineffective because they failed to have the prospective jurors informed of the race of the victims, failed to question prospective jurors on racial bias, and failed to object to the state's improper use of peremptory challenges to remove black prospective jurors from the panel.

Petitioner first raised these arguments in his MAR and third amendment to MAR as Claims I.A, I.B, and I.C. The MAR court found the claims were procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because they could have been, but were not, raised on direct appeal. See Nov. 2002 MAR order at 2, 12-13, 16. Alternatively, the MAR court denied the arguments on the merits.

Respondent argues that because the claim was found to be

procedurally barred by the MAR court, it is procedurally defaulted. Under the doctrine of procedural default, a federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). A state rule is "adequate" if it is firmly established and regularly and consistently applied by the state court. Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not depend upon a federal constitutional ruling. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000) (citing Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985)).

Procedurally defaulted claims can be reviewed by a federal habeas court if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. To show cause, a petitioner must show something external prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. United States v. Frady, 456 U.S. 152 (1982). To establish a "fundamental miscarriage of justice," a petitioner must show "that he is actually innocent of the charges against him." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citing Coleman, 501 U.S. at 750).

Subsection 15A-1419(a)(3) provides that a motion for

appropriate relief must be denied where "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(3). Subsection 15A-1419(a)(3) has been found to be an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams v. French, 146 F.3d 203, 217-18 (4th Cir. 1998). Therefore, the court is precluded from reviewing the claim unless the petitioner can establish cause and prejudice or a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750.

To avoid procedural default, petitioner asserts it was unreasonable in light of the record for the MAR court to find he could have raised these arguments of ineffective assistance of trial counsel on direct appeal. Under North Carolina law, a defendant is required to raise a claim of ineffective assistance of counsel on direct appeal that is apparent from the record. State v. Fair, 354 N.C. 131, 167, 667 S.E.2d 500, 525 (2001). Ineffective assistance of counsel claims are procedurally barred when the record on appeal reveals that "no further investigation would have been required to raise the claim on direct review." Lawrence v. Branker, 517 F.3d 700, 715 (4th Cir. 2008).

Petitioner's claims, which all deal with the failure of trial counsel to ask certain question during voir dire or make certain challenges during voir dire were readily apparent from the record at the time of direct appeal and did not require further investigation to raise the issue on direct appeal. Consequently,

petitioner cannot avoid procedural default based on the basis the claims could not have been raised on direct appeal.

Petitioner also argues that appellate counsel's failure to raise the claims on direct appeal establishes cause to excuse the procedural default. Ineffective assistance of counsel may constitute cause to excuse a procedural default. Murray v. Carrier, 477 U.S. 478, 488 (1986). To establish cause based on ineffective assistance of counsel, a petitioner must demonstrate he received ineffective assistance in violation of his Sixth Amendment rights. Id. at 488. To rely upon ineffective assistance of counsel as grounds for cause, a petitioner must have first raised the argument as an independent claim in state court. Id. at 489. In his MAR, petitioner argued that insofar as appellate counsel failed to properly preserve the issue for review, counsel's failure constituted ineffective assistance of appellate counsel.[18] Therefore, the court will consider whether ineffective assistance of appellate counsel will excuse the procedural default.

To establish ineffective assistance of appellate counsel in violation of the Sixth Amendment a petitioner must show counsel's representation was objectively unreasonable and a reasonable probability exists that, but for the attorney's error, he would have prevailed on his appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland v. Washington, 466 U.S. 668, 687-88

---

[18] Petitioner does not raise an independent claim of ineffective assistance of appellate counsel in his federal habeas petition, but only raises the argument as a basis to establish cause and prejudice to excuse procedural default.

(1984)). Therefore, to overcome the procedural default, petitioner must show it was objectively unreasonable for counsel not to assert the claims, and also that petitioner was prejudiced by the failure because there is a reasonable probability his claims would have succeeded on appeal.

A.

First, the court considers whether petitioner can show ineffective assistance of appellate counsel because counsel failed to argue on appeal that trial counsel were ineffective for not challenging six jurors who indicated they were biased toward the death penalty or could not be impartial: Juror Patterson, Juror Fish, Juror Matthews, Juror Owen, Juror Parker, and Alternate Juror Johnson.[19]

The Sixth and Fourteenth Amendments "guarantee[ ] a defendant on trial for his life the right to an impartial jury." Morgan v. Illinois, 509 U.S. 719, 728 (1992). To establish ineffective assistance of counsel, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The court must judge the

---

[19] In the MAR, petitioner argued counsel were ineffective for failing to challenge six jurors who were incompetent. In his habeas petition he referred to "two jurors who said they would automatically vote for the death penalty" without identifying the jurors by name. Petition at 54, ¶ 172. Petitioner was directed to clarify for the court, and in a subsequent filing indicated the reference to "two jurors" was a mistake and he was challenging all six of the jurors. See D.E. #44.

reasonableness of counsel's performance based upon the specific facts of the case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690.

As an initial matter, neither juror Annie Matthews, nor alternate juror Bonnie Johnson, deliberated at trial. Ms. Matthews was excused as a juror prior to any deliberations and replaced with first alternate Elizabeth Parker. See St. Ct. Rec. Vol. 12 of 45 at 65-66. Ms. Johnson was an alternate who was not needed as a juror. Because these jurors did not deliberate, petitioner cannot show prejudice from his attorney's failure to challenge these jurors during voir dire. Cf. Ross v. Oklahoma, 487 U.S. 81, 85 (1988) (holding no constitutional violation for court's failure to grant challenge for cause since juror did not ultimately sit on the jury). Therefore, petitioner cannot show prejudice from appellate counsel's failure to raise the issue on direct appeal.

The court next considers petitioner's argument with respect to Jurors Patterson and Fish. Upon questioning by defense counsel, Juror Patterson indicated she believed the death penalty was the appropriate punishment if petitioner was convicted of two counts of first-degree murder. See St. Ct. Rec. Vol. 3 of 45 at 13-15. However, defense counsel continued his questioning:

> Mr. Lytch: Now, irrespective of your feelings as you're sitting here now, do you think that you could put aside your personal feelings, listen to the law from His Honor, apply it to the facts that you have heard as a juror —
>
> Juror Patterson: Uh-huh [yes].
>
> Mr. Lytch: - and be fair and impartial, not only in guilt/innocence, but in the imposition of either life or

39

death?

Juror Patterson: Yes.

Mr. Lytch: So, again, I'm not putting words in your mouth, then as I understand you, you will listen to the Judge's instructions on that issue and apply what he tells you to what you have already heard from the witness stand. Is that a fair statement?

Juror Patterson: Right.

Mr. Lytch: So that means that you – I assume that means, and correct me if I'm wrong, that you could consider life in prison as a possible option even though it turns out to be especially heinous and atrocious or cruel murder?

Juror Patterson: Right. Uh-huh [yes].

Id. at 15-16. At the end of questioning, the defense accepted Juror Patterson. Id. at 19.

With respect to Juror Fish, the record similarly reflects that when initially questioned by defense counsel, she indicated if petitioner was convicted of two murders she would be in favor of the death penalty. See St. Ct. Rec. Vol. 6 of 45 at 20-21. However, during further questioning by Mr. Lytch the following occurred:

Mr. Lytch: Okay. But if the State satisfied you and in the first phase of the proceeding beyond a reasonable doubt, then you get to the second phase, nothing else appearing, if the State has shown to you by its evidence that two brutal murders have taken place and if George Earl Goode has not testified, am I understanding you correctly to say that at this point in time you'd then be a hundred percent sure and you could and would impose the death penalty?

Juror Fish: I'm not sure about that. I'm not sure.

Mr. Lytch: Okay. All right. Let me add another little factor to this if I might, Ms. Fish. In the process of the trial of this case and His Honor will be giving you what we call instructions, okay, that will be things that

40

relate to the law. The law is not what I say or what Mr. Lock says, but it will be [what] His Honor says it is. Do you understand that?

Juror Fish: Yes, sir.

Mr. Lytch: Now as part of that process, if you get to the second phase in this proceeding, His Honor will instruct you concerning what we call aggravating circumstances, that is circumstances that say that this case is more deserving of the imposition of the death penalty; and you will also be instructed on the existence of what we call mitigating circumstances, that is circumstances that would say this case is less deserving of the death penalty. Do you understand that?

Juror Fish: Yes, sir.

Mr. Lytch: Do you think you could take the instructions from His Honor and fairly consider both aggravating and mitigating circumstances in your deliberation at the sentencing phase if he's convicted of first degree murder?

Juror Fish: Yes, sir. I could.

Mr. Lytch: How do you feel about life imprisonment?

Juror Fish: I have no problem with that.

Mr. Lytch: At this point in time would you say you have strong feelings one way or the other for life imprisonment or death penalty?

Juror Fish: No, sir.

Mr. Lytch: So as we're sitting here at this point in time we're - both of those are on kind of a level playing field in your mind?

Juror Fish: Uh-huh [yes].

Id. at 21-23 (alteration in original). At the conclusion of his questioning, Mr. Lytch accepted Ms. Fish. Id. at 24.

"A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91 (1955)). "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities." Romero v. Lynaugh, 884 F.2d 871, 878 (5th Cir. 1989).

As the voir dire of Ms. Patterson and Ms. Fish reveals, although both women initially indicated they believed the death penalty was the appropriate punishment if a person was convicted of two murders, upon further questioning both women indicated they could put aside their initial reactions, listen to the jury instructions, and consider life imprisonment as well as the death penalty. After hearing the voir dire of each juror, counsel, who was present in court to observe the demeanor and tone of the prospective jurors on the issue and other voir questions, made the judgment to accept Ms. Patterson and Ms. Fish. Petitioner fails to show that these decisions by counsel were objectively unreasonable or that, but for counsel's decision, the result of the proceedings would have been different.

As petitioner is unable to show he received ineffective assistance of trial counsel, he is unable to show he was prejudiced by appellate counsel's failure to raise the issue on appeal. Consequently, he fails to establish cause and prejudice to overcome the procedural default of this portion of Claim III in the petition.

Next, the court considers petitioner's argument with respect

to Juror Millie Owen. In his MAR, petitioner complained about the

following portion of Ms. Owen's voir dire:[20]

> Mr. Lytch: Do you think it would have any impact on you
> one way or the other if he elected not to testify?
>
> Juror Owen: I don't think that we would get all the
> information anyway that we needed, wouldn't we, the
> jurors?
>
> . . .
>
> Mr. Lytch: Tell me how you feel about the fact that - - -
>
> Juror Owen: How would we get the information? From what
> other source?
>
> Mr. Lytch: Well, I can't answer your question
> unfortunately. But if he were not to testify how -- Do
> you think that would interfere with your ability to be
> fair and impartial in your deliberations in this case?
>
> Juror Owen: I'll just say I'd be as fair as I possibly
> could.
>
> . . .
>
> Mr. Lytch: . . . tell me how you feel about the death
> penalty?
>
> Juror Owen: I'm for the death penalty.
>
> Mr. Lytch: Can you expand upon that just a little bit for
> me, please, ma'am?
>
> Juror Owen: Well, I just feel like if you take someone
> else's life they should give theirs.
>
> Mr. Lytch: Do you feel pretty strongly about that?
>
> Juror Owen: Well, not in every case. It would be
> different in different cases.

---

[20] In his petition and other filings before this court he
does not make specific arguments for each juror, but rather
contends the MAR court's finding with respect to his arguments
below were unreasonable. See Petition at 53-55; Reply at 28; and
Response to Order to Clarify Argument in Claim III. (D.E. #44).

St. Ct. Rec. Vol. 6 of 45 at 125-127.

Although Ms. Owen indicated she was generally "for the death penalty," upon questioning she made clear she did not feel the death penalty should be automatic in every case. When asked whether she could fairly and impartially consider both life and death, she answered yes. Id. at 118-119, 129. Although she expressed some concern over the impact of petitioner not testifying, when subsequently asked by defense counsel "[b]ut if he were not to testify, I understand that you – but do you think that that would have an affect on your ability to be fair and impartial ----," Ms. Owen responded "No." Id. at 126. When counsel continued the line of questioning, she remained firm in her answer that his decision not to testify would not influence her ability to be fair and impartial. Id. Moreover, petitioner testified at trial. Consequently, petitioner cannot show ineffective assistance of counsel due to trial counsel's failure to challenge Ms. Owen for cause and therefore, cannot show ineffective assistance of appellate counsel for failing to raise the claim on appeal.

Finally, the court considers petitioner's argument with respect to Juror Elizabeth Parker.[21]  In particular in the MAR he cited the following portion of Ms. Parker's voir dire:

Mr. Lytch: Do you understand that — How do you feel about the fact that he – if he elected not to testify in this case?

---

[21] Ms. Parker was selected as the first alternate juror, but was seated as one of the jurors when the court excused Ms. Matthews prior to deliberations. See St. Ct. Rec. Vol. 12 of 45 at 65-66.

Juror Parker: If he elected not to testify?

Mr. Lytch: Yes, ma'am.

Juror Parker: I feel like I would have to hear his side of it.

Mr. Lytch: Should you not hear his side of it do you think that would impair your ability, substantially impair your ability to be fair and impartial in your deliberations otherwise?

Juror Parker: Not if the other evidence, I guess was concrete, if I felt like it was.

Id. at 195-96.

Nothing in this response shows Ms. Parker was unable to be a fair and impartial juror if petitioner did not testify. Although Ms. Parker expressed a desire to hear petitioner's version of the events, she ultimately stated that if she did not hear his side it would not impair her ability. She also indicated she understood the burden of proof rested with the State to prove the case beyond a reasonable doubt. Id. at 196. Moreover, petitioner did testify at trial. Consequently, petitioner cannot show he was prejudiced by counsel's failure to challenge Ms. Parker for cause and cannot show ineffective assistance of appellate counsel for failing to raise the claim on direct appeal.

B.

The court next considers whether petitioner can show ineffective assistance of appellate counsel because counsel failed to argue on appeal that trial counsel were ineffective for not informing potential jurors of the race of the victims and questioning them about racial bias. Petitioner argues trial

counsel should have asked the jurors if they had any racial biases or if they believed a white person was more likely to be telling the truth than an African-American person.

As noted by the Fourth Circuit in Sexton v. French, 163 F.3d 874 (4th Cir. 1998), the Supreme Court has recognized the decision whether to question potential jurors about racial bias is a decision left to counsel. Sexton, 163 F.3d at 886 (citing Turner v. Murray, 476 U.S. 28, 37 n.10 (1986)). As such, it is a strategic decision entitled to deference. See Strickland, 466 U.S. at 689. Although petitioner now believes the jury should have been questioned about racial bias, petitioner does nothing more than offer his position, in retrospect, that his defense would have benefitted from the questions. Petitioner fails to provide any information or evidence suggesting any of the jurors seated on the panel were racially biased. Moreover, he has not provided any information or evidence suggesting counsel was not acting strategically by not asking such questions.

Further, to the extent petitioner relies upon Turner v. Murray, his reliance is misplaced. Turner holds that, in the case of an interracial crime, the defense is entitled during voir dire to inform potential jurors about the race of the victim and question prospective jurors about racial bias. Turner, 476 U.S. at 36-37. Nothing in Turner establishes defense counsel must question jurors about racial bias in the case of an interracial offense or that the failure to conduct such questioning amounts to ineffective assistance of counsel. Id. at 37 n.10. Consequently, petitioner

is unable to show ineffective assistance of appellate counsel for failing to raise the argument and is unable to overcome the procedural default of this argument.

C.

Finally, the court considers whether petitioner can show ineffective assistance of appellate counsel because counsel failed to argue on appeal that trial counsel were ineffective for not objecting to the State's improper use of peremptory challenges against three black prospective jurors. Petitioner raised this argument as Claim I.C in his MAR. In the MAR, petitioner identified the jurors as John Truman McNeil, Artis Lewis McDougald, and Levi Dixon.[22]

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the Supreme Court held that the use of peremptory challenges on the basis of race gives rise to a claim of racial discrimination in violation of the Fourteenth Amendment. <u>Batson</u>, 476 U.S. at 96-97. Under <u>Batson</u>, a defendant has the initial burden of establishing a *prima facie* case of discrimination by showing facts which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of race.

If the defendant meets his burden, the burden of production then shifts to the State to come forward with a race-neutral explanation. <u>Id.</u> at 96-98. The prosecutor's explanation is

---

[22] Petitioner refers to Artis Lewis McDonald, <u>see</u> St. Ct. Rec. Vol. 16 of 45, Tab 1 at 24, but a review of the trial transcript indicates his name is McDougald, not McDonald.

evaluated on its face and will be deemed race neutral unless a discriminatory intent is inherent in the explanation. <u>See</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991). Finally, if a race-neutral explanation is tendered, the trial court must decide whether the defendant has proven purposeful discrimination. <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995) (per curiam) (citations omitted). The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. <u>Purkett</u>, 514 U.S. at 768.

During questioning, Mr. McNeil indicated he had previous dealings with both of petitioner's lawyers and one of them, Alan Lytch, had represented him in a matter. St. Ct. Rec. Vol. 5 of 45 at 114-115. Mr. McNeil also expressed he was opposed to the death penalty. <u>Id.</u> at 116. Similarly, Artis Lewis McDougald expressed during voir dire that he was generally opposed to capital punishment and would have a hard time committing the defendant to death. St. Ct. Rec. Vol. 6 of 45 at 111. In fact, although it was denied by the court, the State attempted to have Mr. McDougald removed for cause before exercising a peremptory challenge to remove him from the jury. <u>Id.</u> at 111, 115. The third juror, Mr. Dixon expressed he was opposed to the death penalty and that his opposition was due to his "religious background and training whereby I believe life is a natural right given by God, and as a human being I'm not to say who lives or dies." <u>Id.</u> at 138. Mr. Dixon also indicated he knew petitioner's attorney, Mr. Lytch, because Mr. Lytch had drafted the separation agreement and divorce

decree for he and his first wife.  Id. at 136.

Given these readily apparent race-neutral reasons, trial counsel did not act objectively unreasonable in failing to raise Batson challenges.  Further, even assuming counsel had raised a Batson challenge, petitioner was unlikely to succeed. Consequently, petitioner is unable to show ineffective assistance of appellate counsel because counsel failed to raise this claim.

Finally, petitioner asks the court to conduct a hearing de novo on these issues.  Petition at 55.  However, petitioner cannot show a factual dispute that if resolved in his favor would entitle him to relief.  See Rector, 120 F.3d at 562-63.

Petitioner fails to establish grounds to overcome the procedural default and the court is barred from considering the merits of the claim.  Respondent's motion for summary judgment as to Claim III is granted.

4. Claim IV -Petitioner received ineffective assistance of counsel because counsel failed to adequately prepare to meet the State's evidence and failed to present available psychiatric evidence

In Claim IV, petitioner asserts he received ineffective assistance of counsel at trial because his attorneys failed to take various steps to investigate and present available and favorable evidence in violation of Strickland v. Washington.  The claim is broken into five arguments.

A. Claim IV.A.

In Claim IV.A., petitioner argues he received ineffective assistance of counsel at trial because his attorneys failed to take

49

adequate steps to meet the misleading evidence from Agent Deaver that there was blood found on petitioner's boot.  Petitioner argues that without expert assistance, counsel were reduced to cross-examining Agent Deaver only to establish he could not tell if the blood was human or animal blood.  Petitioner argues that expert assistance would have helped the defense show Agent Deaver did not test for or find blood on petitioner's boot.

The MAR court found this claim to be procedurally barred because it could have been raised on direct appeal.  Dec. 2004 MAR order at 27-28.  The MAR court alternatively denied the claim on the merits.  Id. at 29.

Respondent contends the claim is procedurally defaulted because it was found to be procedurally barred by the MAR court.[23] In response, petitioner argues the claim is not procedurally defaulted because a procedural bar is not consistently applied by the state courts under similar circumstances and he was not in a position to adequately raise it because the facts were not ascertainable from the record on appeal.

Ineffective assistance of counsel claims are procedurally barred when the record on appeal reveals that "no further

_____

[23] In his reply brief, petitioner argued respondent never raised an issue of procedural bar before the MAR court.  He argued the issue was inserted in the proposed order the State prepared and submitted to the MAR court.  However, at the oral arguments held before this court on September 10, 2009, petitioner acknowledged that respondent had in fact raised the assertion the claim was procedurally barred prior to the proposed order.  Respondent also presented evidence showing the issue was raised before the MAR court in a post-hearing brief to which petitioner responded.  See D.E. #51.

investigation would have been required to raise the claim on direct review." Lawrence v. Branker, 517 F.3d 700, 715 (4th Cir. 2008). It was not until post-conviction proceedings that petitioner's counsel learned Agent Deaver had only conducted a phenolphtalein test and had never performed a conclusive test for blood. It was only at that time it became apparent Agent Deaver's testimony was misleading and that counsel may have been ineffective by not hiring an expert in serology at trial to address Agent Deaver's testimony. Therefore, the procedural bar is not an independent and adequate basis to support a procedural default in this court, and the court will consider the argument on the merits.

## Factual Background

Petitioner's trial started on November 1, 1993, and on the afternoon of November 8, 1993, for the first time the State presented the defense with a report prepared by Agent Deaver. The report was also dated November 8, 1993.[24] Agent Deaver's report stated petitioner's boot, labeled item #31 in the report and exhibit #115 at trial, tested positive for the presence of blood. Specifically, the report provides in pertinent part, "Results of Analysis: Examination of Item #31 gave chemical indications for the presence of blood. The quantity of the stain was insufficient to test further. Examination of Items #32a, #32b, #32c, and #32d

---

[24] Agent Deaver testified he was given various items of clothing from the alleged perpetrators from Lieutenant Eatman on October 27, 1993, and was asked to examine the items for the presence of blood and the type of blood stains.

failed to reveal any visible bloodstains."[25]

The defense made a motion to suppress Agent Deaver's report and testimony on the basis of the late timing. The defense argued there was insufficient opportunity for it to run additional tests. The defense noted the report was the first time evidence linked to petitioner had come back positive for the presence of blood and that the defense previously had been told all of the evidence linked to petitioner had come back negative for the presence of blood. St. Ct. Rec. Vol. 10 of 45 at 184. The defense argued the evidence was a surprise, the fact the State wanted to call Agent Deaver as a blood spatter expert was a surprise, and they were unfairly disadvantaged because they did not have an expert to help address the evidence or help them prepare to cross-examine Agent Deaver. St. Ct. Rec. Vol. 11 of 45 at 8-9. They argued it was a denial of petitioner's due process rights to allow the evidence which the defense had been ambushed with in the midst of trial. Id. at 11-12.

The court heard Agent Deaver's testimony on voir dire and argument from the parties on Friday, November 12th. On Monday, November 15th, the trial court denied the motion to suppress. Id. at 21-22. Thereafter, the State continued to present its case before the jury. The State presented two witnesses and then called Agent Deaver. After the State tendered Agent Deaver as an expert, the defense asked for a recess, but then asked the court to speak

_____

[25] Items #32a, #32b, #32c, and #32d are petitioner's sweat pants, overalls, boxers, and were all tested by Agent Deaver.

with their client for a moment. Id. at 74. The court offered to take a recess and the State offered to call another witness before proceeding with Agent Deaver to allow the defense additional time. Id. Defense counsel then said he was unsure a recess would help because the defense had already tried to locate an expert without success. Id. at 75. The trial judge indicated court would recess for ten minutes, but if the defense required longer he would allow additional time. Id.

After the recess, defense counsel indicated that despite their efforts they were unable to locate an available expert in North Carolina. Id. at 76. Mr. Denning stated:

> In reference to, we have, for the record, we have called private detectives, other attorneys, even the North Carolina Death Penalty Resource Center, and the Academy of Trial Lawyers. None of these people know any experts in this particular field. I've discussed it with Mr. Deaver. He does not know any in North Carolina and I believe he said he knew two in Tennessee, but I [Deaver] don't remember the names . . . . I have - cannot find any printed material on this short of notice and I need you to put that in the record.

Id. at 76.

Defense counsel also objected to Special Agent Deaver being qualified as an expert, arguing he had relatively limited training and background in the area. Id. at 77. The court ultimately accepted Agent Deaver as an expert in the fields of forensic serology and blood stain pattern interpretation. Id. at 83. The defense noted a continuing objection. Id. Defense counsel also subsequently objected when Agent Deaver was asked to tell the jury the results of his test. Id. at 90.

In generally discussing all of petitioner's ineffective assistance counsel claims, the MAR court noted that the arguments about counsel "must be considered in the context of their overall preparation, and the facts and circumstances known to them at the time." MAR Order at 14. The MAR court noted the efforts taken by counsel in preparing to defend petitioner. Id. at 18-21. The court stated that on April 20, 1992, prior to trial, petitioner had recounted his version of the events of February 29, 1992, to Mr. Denning and Mr. Lytch. Id. at 15-16. The MAR court noted that at that point, Goode told his attorneys that when he came outside and saw Mr. Batten lying on the ground, he went over to his body, lifted his head, and dropped it asking the others what happened. He claimed that when Mrs. Batten arrived, he did not do anything when DeCastro grabbed her because he was shocked, but when DeCastro asked him to help put the bodies in the truck he did so. Id. at 16-17. At that time petitioner did not recall if anyone had a flashlight and said he knew nothing about Mr. Batten's wallet and said he did not have Mr. Batten's wallet in his pocket when arrested. Id. at 17. The MAR court noted that this statement to his attorneys was in contrast to the version of events to which he testified at trial. Id. at 17-18.

In specifically addressing Claim IV.A, the MAR court recounted the events surrounding the late timing of the notice of Agent Deaver's testimony, the arguments made by the defense to exclude the testimony, and efforts made by counsel to find an expert for

the defense. MAR Order at 23-26. The MAR court also noted that during the cross-examination of Agent Deaver, Mr. Denning elicited Agent Deaver could not determine whether the substance on the boot was human or animal blood and could not determine when or where the blood got on the boot.

The MAR court concluded petitioner could not show constitutionally deficient performance by counsel. Id. at 29. The court reasoned that:

> Mr. Denning and Mr. Lytch did everything possible at the time to attempt to prepare for and counter the evidence and testimony of Agent Deaver. Contrary to Goode's argument that there were available experts that Mr. Denning and Mr. Lytch could have contacted, the evidence and record show that neither the consultants at the North Carolina Resource Center nor the North Carolina Academy of Trial Lawyers were able to provide Mr. Denning and Mr. Lytch a name of an expert to call. Therefore, it is understandable that Mr. Denning told Judge Ellis that there would not be a need for a recess; there were no possible leads as to an expert.

Id. at 30. The court also noted petitioner had at one time told his attorneys he helped move the bodies, and "if true, it would have been surprising and unlikely that Goode could have avoided getting blood on his clothing or his footwear." Id. The court noted petitioner's story had evolved from when he talked to his attorneys and admitted to helping move the bodies into the truck until later, after learning the SBI lab report did not find blood on him, he changed his story and testified he never touched the bodies. Id. at 30-31.

The MAR court reasoned that as counsel knew his story changed and he had admitted early on to moving the bodies, "it is not

surprising that they did not insist on a recess to attempt to secure an expert in serology or blood spatter interpretation." Id. at 31. The MAR court concluded petitioner could not show deficient performance because they had not insisted on a recess to find an expert. Id. The court further concluded "[u]nder the circumstances, including the evidence that was presented at trial, and now the evidence which has come to light at the evidentiary hearing, this Court concludes that Goode has failed to show that he was prejudiced by his trial attorneys' failure to prepare for the introduction of the serology evidence, to submit such evidence to adversarial testing, and to prevent the impression that the victims' blood might have been on Goode's boots." Id. at 34.

## Analysis

Petitioner argues the MAR court's ruling is based, at its core, on the unreasonable finding that because petitioner told his attorneys he helped moved the bodies, it justified counsel's failure to get an expert serologist. Petitioner argues that any suggestion counsel were justified in not seeking a serologist because petitioner had admitted to touching the bodies is an a unreasonable application of clearly established federal law as set forth in Rompilla v. Beard, 545 U.S. 374(2005) and Wiggins v. Smith, 539 U.S. 510 (2003). Petitioner also argues that the MAR court's ruling that he was not prejudiced is unreasonable in light of the evidence presented.

The court need not address petitioner's arguments with respect to the performance prong of Strickland as petitioner cannot show he

was prejudiced by any alleged failure of counsel. As discussed pursuant to Claims I and II, supra, with respect to the blood on the boot evidence defense counsel elicited on cross-examination that Agent Deaver was unable to determine if the invisible spot of blood was even human and did not know when or where it had gotten on petitioner's boot. When the limitations of Agent Deaver's testimony are coupled with the evidence the State presented of petitioner's guilt, such as the testimony from Patrick Byrd, the fact petitioner was found with the victim's wallet, eyewitness accounts placing a minimum of three men involved in the beating of Mr. Batten, evidence petitioner was one of three men at the scene when the police arrived, and evidence that Glen Troublefield was found a considerable distance from the scene, petitioner cannot show he was prejudiced by any failure of his attorneys to get an expert in serology to challenge Agent Deaver's testimony about a single microscopic spot of some unknown type of blood on petitioner's boot.

B. Claim IV.B

In Claim IV.B, petitioner argues his trial attorneys were ineffective in failing to meet the misleading evidence from Agent Deaver that a person could be involved in a crime of the nature in this case without getting any visible blood on him. Petitioner argues that without expert assistance, trial counsel were not able to refute this highly damaging testimony.[26]

---

[26] The parties appeared before the court on September 10, 2009, and presented oral argument on this claim.

Petitioner first raised this argument in his MAR. In its ruling, the MAR court addressed the argument in the same discussion it addressed his claim that counsel were ineffective for failing to address the evidence and testimony there was blood on petitioner's boot. See Dec. 2004 MAR order at 22-35. The MAR court held petitioner's claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3). Id. at 28. The MAR court reasoned that because the arguments had been raised at the time of direct appeal as a due process claim, petitioner was in a position to raise the ineffective assistance of counsel claim on direct appeal.[27] Id. at 27-28. The MAR court alternatively denied the claim on the merits. Id. at 29.

Respondent argues the claim is procedurally defaulted because it was found to be procedurally barred by the MAR court. Petitioner argues the claim is not subject to procedural default because he was not in a position to raise the claim on direct appeal, and procedural bars are not regularly and consistently applied to claims of this nature by the state courts.

Ineffective assistance of counsel claims are procedurally barred when the record on appeal reveals that "no further investigation would have been required to raise the claim on direct review." Lawrence, 517 F.3d at 715. In contrast to petitioner's due process claim raised on appeal, petitioner's claim asserting

---

[27] On direct appeal, petitioner argued his due process rights were violated because the defense was not given adequate notice of the blood stain expert's report.

ineffective assistance of counsel was not apparent from the record and required evidence and investigation not available at the time of direct appeal. Petitioner's claim rests on expert evidence contradicting Agent Deaver's trial testimony. The evidence from Dr. Miller and Dr. Sporn, or any similar expert, was not part of the record on appeal and therefore, could not have been presented on direct appeal. See N.C. R. App. P. 9(a). Without such evidence there is nothing to suggest petitioner had been prejudiced by any alleged error of counsel and petitioner could not make his claim. Therefore, the procedural bar will not support a procedural default in this court, and the claim will be considered on the merits.

## Factual Background

At trial, Agent Deaver testified "one could not be excluded from having inflicted at least some of the injuries on these individuals simply because they do not have blood staining on their clothing." St. Ct. Rec. Vol. 11 of 45 at 98. Before offering his opinion, Agent Deaver testified that "[v]ery rarely does an initial injury create blood stains either on anything that's present in the crime scene or anything around it – around the injuries themselves." Id. at 95. He noted that factors such as clothing could impact the types of blood staining that occurs. Id. at 96. On cross-examination, defense counsel asked Agent Deaver whether it was consistent with the fact petitioner did not participate that he did not have blood on him. Id. at 109. Agent Deaver agreed it was certainly possible if a person was not involved in violence there would be no blood, but reiterated it was his opinion you could not

rule out a person as being involved in violence simply because he did not have blood on him. Id. at 109-110.

Dr. Radisch, the forensic pathologist who performed the autopsies of the victims, testified that in her opinion it would have been possible for a perpetrator to inflict at least the three shallow wounds on Mr. Batten's back without getting blood on him. St. Ct. Rec. Vol. 10 of 45 at 67 -68.

In support of his MAR, petitioner presented evidence from Dr. Marilyn Miller, an expert in forensic serology, bloodstain analysis, and crime scene reconstruction. St. Ct. Rec. Vol. 26 of 45 at 1187, 1213-14, 1217, 1219. Dr. Miller's affidavit submitted in support of the MAR states in part that "[t]he absence of bloodstains on the clothes indicates that George Goode was not in close proximity to bloody objects or was 'shielded' in some manner to the bloodshed activity." St. Ct. Rec. Vol. 16 of 45, Tab 1, Appendix A. At the MAR hearing, Dr. Miller testified her opinion was that based upon the lack of bloodstains on petitioner's clothing, "George Goode was not in close proximity to bloodshed events." St. Ct. Rec. Vol. 26 of 45 at 1239.

She specifically disagreed with Agent Deaver's testimony that someone could have participated in the crimes without getting blood on them. Id. at 1240. She stated, "[b]ased upon the type of wounds that were present, the activity of the victims, the types of stains that were present on all of the items of clothing, there is no way that someone can be an active participant in a stabbing and a beating of this type and not get any blood on them." Id. When

questioned about the fact Mrs. Batten's blood was not found on any of the perpetrators, Dr. Miller testified she believed it was a result of limitations in the technology used for the testing at the time and the fact that not all samples were tested. Id. at 1245-46.

On cross-examination, Dr. Miller clarified her statement in her affidavit that petitioner was either "not in close proximity to bloody objects or was shielded in some manner to the bloodshed activity." She explained her definition of shielded meant he was not an active participant and she believed he could not have been actively involved and not gotten blood on him. Id. The prosecutor also challenged the reliability of Dr. Miller's opinion in light of a training video she had made. The prosecutor showed the video in which Dr. Miller simulated a medium force impact spatter and although only 18 to 20 inches from the source did not get blood on her. Id. at 1270-1272. Dr. Miller testified her demonstration was not comparable to blood circulating in a human body. Id. at 1272-73. Finally, when asked "if George Goode had been the perpetrator of the first stab wound on Mr. Batten, would you agree that it would be possible for him to attack Mr. Batten and not obtain any blood spatter on his clothing?" Dr. Miller replied, "[o]nly from the stabbing action only, that's possible." Id. at 1274.

Petitioner also relied upon evidence from Dr. Thomas Sporn, a forensic pathologist, in support of his MAR.[28]  Dr. Sporn's

---

[28] Dr. Sporn, like Dr. Radisch, is not a blood spatter expert, but testified based on his general medical experience.

affidavit indicated that given his experience caring for patients with sharp force wounds, he believes the person who inflicted the Battens' wounds "would have demonstrable victim blood on their person or clothing." St. Ct. Rec. Vol. 16 of 45, Appendix B. Dr. Sporn testified that as a pathologist he had worked on many cases in which the decedent was stabbed to death. Id. He also indicated he had experience with live victims who suffered sharp force wounds. Id. at 2138. When asked if he believed an assailant in the case could have inflicted the wounds without getting blood on him Dr. Sporn responded, "[w]hile it is possible that an assailant could have inflicted these patterns of wounds without grossly contaminating himself or herself with blood, I think it more likely than not that the pattern of wounds, as received by these two decedents, would have resulted in some contamination of the assailant by blood." Id. at 2141-42.

Both of petitioner's trial attorneys, Mr. Denning and Mr. Lytch, also submitted affidavits in support of the MAR and testified at the evidentiary hearing on the MAR.

## MAR Court's Ruling

In denying petitioner's claim on the merits, the MAR court noted "Mr. Denning further elicited from Agent Deaver that no blood spatter or bloodstains were detected on Goode's clothing and that 'the fact that [Goode] did not have blood spatter on [his clothing] is consistent with the fact that he did not take part in this particular homicide.'" Dec. 2004 MAR order at 26-27. The MAR court, citing to language from the opinion of the North Carolina

Supreme Court ruling on the due process claim, noted, "'[t]hus, not only did [Mr. Denning] have the opportunity to thoroughly cross-examine Agent Deaver regarding the absence of blood on defendant, but he was also able to elicit favorable testimony from him.'" Id. at 27 (citing State v. Goode, 341 N.C. at 535, 461 S.E. 2d at 644). The court concluded petitioner could not show deficient performance because Mr. Denning and Mr. Lytch did everything possible to prepare for and counter the evidence under the circumstances. Id. at 29-30. The court rejected petitioner's argument there were experts available at the time finding that counsel took steps to locate an expert, and even after consulting the North Carolina Academy of Trial Lawyers and the Death Penalty Resource Center were not able to come up with a possible lead on an expert. Id. at 30. The court also noted petitioner had told counsel he picked up Mr. Batten's head and helped move the bodies. The court reasoned in light of this knowledge, "it is not surprising that they did not insist on a recess to attempt to secure an expert in serology or blood spatter." Id. at 31.

The MAR court further concluded petitioner could not show prejudice. The MAR court noted the strength of the State's case against petitioner. Id. The MAR court stated it did "not find many of Dr. Miller's ultimate conclusion to be credible or worthy of weight." Id. at 32. The MAR court reasoned Dr. Miller's testimony in her affidavit that petitioner could have been involved if shielded, contradicted her testimony at the hearing that there was "no way" Goode could have participated in the beatings or

stabbings without getting blood on him. Id. at 32. The court found that Dr. Miller's demonstration video duplicating a medium impact stabbing indicated she had not gotten any blood on her person. Id. The MAR court also found that during her cross-examination she further contradicted her testimony by "conceding that Goode could have inflicted an initial stab wound without getting blood or blood spatter on his person or clothing." Id.

The court found petitioner failed to show Agent Deaver's testimony was not based on accepted scientific principles. The court found Agent Deaver's testimony that a suspect could not be excluded because of the absence of blood on him was corroborated by Dr. Radisch, the pathologist who performed the autopsies. Id. at 33-34. The court also recognized none of Mrs. Batten's blood was positively identified on any of the defendants despite the fact she was stabbed over twenty times. Id. at 34.

Analysis

Petitioner argues the MAR court's determination is based upon an unreasonable determination of the facts and an unreasonable application of Strickland v. Washington. He attacks the MAR court's order insofar as it reasons that because petitioner told counsel he helped move the bodies it made counsel's decision not to seek an expert to refute Agent Deaver's testimony objectively reasonable. He also attacks the MAR court's determination insofar as it rests on the fact counsel made some efforts to get expert assistance. He argues they made insufficient efforts. He contends that as the evidence from his MAR experts demonstrate, there was

available evidence which would have contradicted Agent Deaver's testimony. He argues that counsel's decision to forgo a recess when they did not have the knowledge to address the blood spatter evidence without an expert was patently unreasonable.

To establish ineffective assistance of counsel in violation of his Sixth Amendment rights, a party must show counsel's representation "fell below an objective standard of reasonableness" and there is "a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Strickland, 466 U.S. at 688.

The State's evidence indicated substantial amounts of blood on the clothing of Eugene DeCastro and Chris Goode. In contrast, petitioner had no blood on him. The defense seized on this critical physical evidence, building its case around the premise that the absence of blood on George Goode showed he did not participate in the bloody stabbings. Mr. Denning testified at the hearing on the MAR that this was "the chief feature" of the defense's case. See St. Ct. Rec. Vol. 21 of 45 at 344. The theory was asserted in both the defense's opening and closing statements. See St. Ct. Rec. Vol. 7 of 45 at 16; St. Ct. Rec. Vol. 12 of 45 at 131-33.

Counsel heard a preview of Agent Deaver's testimony during his voir dire. See St. Ct. Rec. Vol. 10 of 45 at 184-208. The voir dire testimony alerted defense counsel that Agent Deaver was going to offer testimony as a blood spatter expert directly undercutting the heart of the defense that petitioner was not a participant in

the stabbings as shown by the fact he did not have any blood on him. Moreover, both Mr. Denning and Mr. Lytch acknowledged they had no experience with this type of scientific evidence. <u>See</u> St. Ct. Rec. Vol. 21 of 45 at 345; St. Ct. Rec. Vol. 22 of 45 at 450-51. Yet, when the trial court offered counsel additional time to find an expert to help address Agent Deaver's highly damaging testimony, counsel proceeded with the trial.[29]

The court recognizes counsel made efforts to find a blood spatter expert by asking other sources, including other attorneys and the Death Penalty Resource Center. However, in light of the significance of the evidence to the defense's case and the court's offer of additional time, the MAR court unreasonably determined counsel were not deficient in failing to accept a recess and make further efforts to find a blood spatter expert.

As the record demonstrates, defense counsel had learned from Agent Deaver that while he could not recall any names at the time, he knew of other experts in the South. Therefore, counsel had reason to believe additional time could help them identify and contact a witness. Moreover, both Mr. Denning and Mr. Lytch testified at the evidentiary hearing on the MAR that as they proceeded with trial, the Resource Center located the name of an expert in Florida. This clearly rebuts the MAR court's finding

_____

[29] Although trial counsel expressed at the hearing on the MAR that they believed the trial court would not have offered additional time since they did not have a name to pursue, nothing in the record supports that interpretation of the trial court's offer of a recess.

66

that no expert was available for the defense to contact. It demonstrates that with the recess openly offered by the court counsel could have located an expert to address and challenge Agent Deaver's blood spatter evidence. Even if the expert was not immediately available, once identified, counsel would have had persuasive grounds to argue for additional time. Under these circumstances, and again, in light of the fact that Deaver's testimony undercut the core of the defense, it was unreasonable not to accept the court's offer of a recess to attempt to locate a blood spatter expert.

Nor can counsel's behavior be rationalized by petitioner's pre-trial statements to his attorneys. At the evidentiary hearing on the MAR, Mr. Denning indicated that nothing petitioner told him in confidence impacted his preparation for trial. See, e.g., St. Ct. Rec. Vol. 21 of 45 at 252. This directly rebuts the MAR court's finding that counsel's conduct in failing to seek a blood spatter expert was supported by statements petitioner made to counsel. Moreover, as petitioner argues, regardless of what counsel knew, once counsel proceeded on a theory that the lack of blood on their client demonstrated his innocence, counsel had to act reasonably to support that theory. See, e.g., Morales v. Ault, 476 F.3d 545, 556 (8th Cir. 2007) (reasonable performance of counsel under Strickland includes developing evidence to support theory).

Therefore, petitioner has shown the MAR court's ruling on the performance prong of Strickland is unreasonable and that counsel acted in an objectively unreasonable manner. Having so found, the

court turns to a consideration of whether petitioner was prejudiced by counsel's deficiency.

At trial, the testimony of any expert or experts for the defense would have been challenged by testimony from Agent Deaver, as well as Dr. Radisch, both of whom believed petitioner could have participated and not gotten any blood on him. Moreover, at the evidentiary hearing on the MAR, Dr. Miller and Dr. Sporn both conceded to some degree it was not impossible a person could have inflicted a single stab wound and not gotten any blood on him. Dr. Sporn acknowledged that although it was unlikely, it was possible. St. Ct. Rec. Vol. 31 of 45 at 2141-42. Even Dr. Miller, who strongly believed a person could not have been an active participant in the murders and not been contaminated with blood, conceded that if George had inflicted only the first stab wound on Mr. Batten it was possible he would not have gotten any blood spatter on his clothing. See St. Ct. Rec. Vol. 26 of 45 at 1274. Consequently, when the State's evidence implicating petitioner, such as the eyewitness who saw all four men participating in the beating and the fact petitioner had the victim's wallet when arrested, is considered in light of the limitations in the expert testimony, petitioner cannot show a reasonable probability of a different outcome at the guilt phase of trial.

However, the potential impact of counsel's error on the sentencing phase is quite different. The question with respect to prejudice at sentencing is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have

concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Wiggins, 539 U.S. at 534. In the scope of a capital sentencing proceeding, to show a reasonable probability of a different outcome, petitioner need only demonstrate that but for counsel's errors, at least one juror would have recommended a life sentence. See Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).

The evidence at trial showed that collectively the victims had been stabbed 27 times and there was significant blood at the crime scene. While Chris Goode and Eugene DeCastro both had blood visible in numerous places on their clothing, petitioner, apprehended almost immediately after the crimes, had no blood on him. The State presented evidence and argument indicating only two knives were used in the attack. Evidence from an expert or experts such as Dr. Miller and Dr. Sporn would have challenged evidence from the State's experts that the lack of blood on petitioner was not an indicator he did not commit the stabbings. Blood spatter experts for the defense would have bolstered the defense's position that the only two knives used in the murders were wielded by Eugene DeCastro and Chris Goode, not petitioner. Defense experts would have lessened the impact, or nullified, the State's blood spatter evidence, and created a substantial question as to whether petitioner was only a much lesser participant in the crimes.

A defense expert also would have undermined the State's argument that the lack of blood on petitioner was not significant because Mrs. Batten's blood was not positively identified on any of

the perpetrators. As Dr. Miller explained at the evidentiary hearing on the MAR, because Mrs. Batten's blood was not positively identified does not mean it was not on Eugene DeCastro or Chris Goode. As she explained, and as is supported by the record, not every area of blood stain on the co-perpetrator's clothing was tested. Also, given limitations in the type of testing available at the time of trial, although Mrs. Batten's blood was not positively identified during testing, it is quite likely that her blood was present on the stains found on the clothing of the co-perpetrators.[30]

Notably, at sentencing for both murders, the jury rejected the mitigating factor that "[t]he murder was actually committed by another person and the defendant was only an accomplice in or accessory to the murder and his participation was relatively minor." If the defense had presented the jury with testimony from a blood spatter expert challenging the otherwise uncontested opinions of Agent Deaver and Dr. Radish, and distancing petitioner from the actual stabbing or at least a substantial part of the stabbing, it is reasonably likely at least one juror would have reconsidered the balance of aggravating and mitigating evidence and decided life imprisonment was the more appropriate sentence.

Accordingly, petitioner has shown the MAR court's ruling is based upon an unreasonable application of Strickland with respect to prejudice at the penalty phase of trial. Petitioner is entitled

---

[30] Some of the samples that were tested by the State produced inconclusive results.

70

to habeas relief with respect to his argument that he was prejudiced at the sentencing phase of trial due to counsel's failure to accept the court's offer of a recess to seek a blood spatter expert.

## C. Claim IV.C

In Claim IV.C, petitioner argues he received ineffective assistance of counsel at trial because his attorneys failed to present credible evidence tending to show Eugene DeCastro wielded the murder weapon. Petitioner argues that at the time of trial, counsel had information from Denslow Garcia, petitioner's sister and Eugene DeCastro's ex-girlfriend, that DeCastro was prone to violence, had a prior conviction for manslaughter, and had threatened to kill her. Trial counsel did not call Ms. Garcia as a witness at trial. Petitioner argues that Ms. Garcia's information about DeCastro would have given the jury evidence DeCastro, not petitioner, wielded the knife used to kill the Battens.

Petitioner also contends that during post-conviction proceedings his attorney discovered evidence, discoverable at the time of trial, that would have further supported the defense position DeCastro wielded the knife. Shortly before the murders, Annie Stowe and Tim Harrison worked at Brother's Pizza with Eugene DeCastro. Both Ms. Stowe and Mr. Harrison said DeCastro was known to carry a knife and had an extremely aggressive nature. Mr. Harrison, who was an owner and manager of the pizza store, said DeCastro was prone to "instant rage." Petitioner argues these

witnesses could have been discovered at the time of trial and there was no trial strategy involved in counsel's failure to present them.

Petitioner first raised this argument as I.G. in his MAR and was allowed to present evidence in support of the claim at the evidentiary hearing. The MAR court denied the claim on the merits. Dec. 2004 MAR order at 35-38. The MAR court found Mr. Denning and Mr. Lytch met with petitioner's family members before trial, including Ms. Garcia, and there was no indication Ms. Garcia presented any of the information about DeCastro to trial counsel that she provided during post-conviction proceedings. Id. at 35. The order further noted that prior to trial, petitioner made statements to the person handling mitigation investigation for the defense that his sister constantly lied, had some type of mental problem, and nothing she said could be trusted. Id. The court found Ms. Garcia's testimony was "highly suspect and questionable as to its credibility." Id. at 35.

The MAR court also determined Mr. Denning and Mr. Lytch had taken steps to investigate the backgrounds of DeCastro and Chris Goode. It noted counsel obtained the criminal histories of both men and the defense researched legal avenues for getting DeCastro's history of violence before the jury at the guilt phase of trial. Id. at 36. The MAR court noted that at sentencing, Mr. Denning attempted to introduce DeCastro's criminal history, but the court ruled it was not admissible.

The MAR court concluded that based on the efforts of counsel,

petitioner could not show the performance of his trial attorneys was objectively unreasonable. Id. The MAR court also concluded petitioner could not show prejudice from any alleged failures of counsel. The MAR court reasoned that if counsel had introduced evidence about DeCastro's violent nature or his past violent acts it likely would have opened the door for the prosecution to admit details that George Goode had previously assaulted someone with a knife and perhaps that Goode had been abusive during his marriage to Helen Goode. Id. at 36-38.

Petitioner asserts the MAR court's findings and conclusions are unreasonable. It is well established that defense counsel must "conduct a thorough investigation of the defendant's background" to identify potential mitigating evidence. Williams v. Taylor, 529 U.S. 362, 396-97 (2000). When a petitioner challenges the decision not to present certain mitigating evidence, the court must consider "whether the investigation supporting counsel's decision not to introduce [the evidence] . . . was itself reasonable." Wiggins, 539 U.S. at 521-23. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A particular decision not to investigate must be evaluated giving a "heavy measure of deference to counsel's judgments." Id.

The record shows counsel met with some of petitioner's family members for over four hours on one occasion and met with them a second time several months later. Id. at 600-601; 674-676. Given the length of time since trial, neither attorney was certain they

had spoken with Ms. Garcia, but Mr. Denning believed he had, and his impression was she would not make a good witness. Id. at 680. Both attorneys recall petitioner said she could not be trusted, lied constantly, and had mental problems. Id. at 625-26; 678-80. Mr. Denning expressed that they certainly would have considered such evidence in deciding whether or not to call Ms. Garcia to testify. Id. at 679-80. Mr. Lytch's testimony indicated that counsel took a considered approach to calling various witnesses. See, e.g., id. at 626-628. Similarly, Mr. Denning's testimony reflects a considered approach to which witnesses were called or not called in mitigation. See, e.g., id. at 674-75.

As the information from the evidentiary hearing before the MAR court shows, Mr. Lytch and Mr. Denning took reasonable steps to develop and present mitigating evidence. Although counsel did not question every witness who petitioner now suggests would have been helpful, the record reflects that counsel took steps to learn about petitioner's background, investigated his school years and military service, and spoke with family members, petitioner's estranged wife, and a pastor from his church. Counsel considered a number of potential witnesses for sentencing whom had been interviewed by either counsel or one of the investigators. St. Ct. Rec. Vol. 23 of 45 at 623, 626. Mr. Lytch testified they investigated the backgrounds of the co-defendants. St. Ct. Rec. Vol. 22 of 45 at 457. Although they did not speak with Ms. Stowe and Mr. Harrison, counsel learned of DeCastro's criminal history and reputation as a violent person. Defense counsel consulted with the Death Penalty

Resource Center and researched the admissibility of such information. St. Ct. Rec. Vol. 23 of 45 at 631-32.

Although petitioner, with the benefit of hindsight, believes the case should have been developed and presented differently, he fails to show the MAR court acted unreasonably in denying this claim of ineffective assistance of counsel. The evidence in the record supports the determination that counsel made a reasonable investigation into which witnesses to present in petitioner's defense. Although at the time of the MAR hearing counsel could not remember their entire thought process from the time of trial, the information supports the MAR court's finding they considered possible witnesses, including Ms. Garcia, but decided as part of a reasoned and strategic choice not to present Ms. Garcia and certain other witnesses.

Moreover, petitioner cannot show prejudice from any alleged error. The theory presented by the State at trial was that two knives, a butcher knife and Gerber knife were used in the attack. The State presented evidence that petitioner owned a Gerber knife. Therefore, evidence showing DeCastro carried a knife and was prone to violence would have done little to help petitioner's case. Consequently, petitioner cannot show the MAR court erred in ruling petitioner could not satisfy either prong of Strickland.

D. Claim IV.D

In Claim IV.D, petitioner argues counsel were ineffective in failing to uncover the mental illness of James Adams, one of the eyewitnesses presented by the State at trial. Counsel for

petitioner describe Mr. Adams as "the sole eyewitness against their client." Petition at 68. In fact, Mr. Adams is one of at least three eyewitnesses to the attack presented by the State at trial. Counsel for petitioner characterize Mr. Adams as the "sole" witness because Mr. Adams was the only eyewitness to describe seeing four men actively involved in the attack. The other eyewitnesses, who witnessed the scene after Mr. Adams, describe seeing three men beating Mr. Batten and a forth standing with a flashlight.[31] Notably, Mr. Adams claimed that he drove away when one of the four men who had been beating Mr. Batten started to approach his car with a flashlight in his hand. The court considered oral argument from the parties on this claim in the hearing held before this court on September 10, 2009.

Petitioner first raised this argument as Claim II.A. in the MAR.[32] The claim was addressed by the parties at the evidentiary hearing. Thereafter, in its December 2004 order, the MAR court denied the claim. The MAR court concluded petitioner was unable to show that counsel were constitutionally deficient in their handling of Mr. Adams as a witness. Dec. 2004 MAR Order at 47-48. The MAR court further concluded even if counsel erred in failing to investigate and present evidence of Mr. Adams' mental health

---

[31] The State's evidence at trial suggested the man with the flashlight matched a description of George Goode.

[32] In the MAR, petitioner also argued the State improperly withheld information about Mr. Adams' mental health from the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963). Petitioner does not make this argument in his petition before this court.

history, petitioner was not prejudiced by any failure.  _Id._ at 51. The court noted Mr. Adams' account of the crimes was generally corroborated by the other eyewitness accounts.  _Id._ at 51.  The court reasoned that even had the attorneys presented the information of Mr. Adams' mental health problems, there was not a reasonable probability of a different outcome at trial.  _Id._ at 59. The court recognized Mr. Adams had a "lengthy mental health history," but noted there was no evidence of mental health problems in his medical record between the day he witnessed the crime and petitioner's trial.  _Id._

Petitioner attacks the trial court's treatment and characterization of the evidence presented about Mr. Adams' mental health history and contends the court unreasonably determined petitioner could not show the performance or prejudice prong of _Strickland_.  Petitioner contends Mr. Adams was a crucial eyewitness because as the only witness to definitely state he saw four men involved in the beating he was the "sole eyewitness" against petitioner.  He therefore, asserts a reasonable probability of a different outcome had Mr. Adams' testimony been undermined.

The information before the court clearly shows that Mr. Adams has suffered substantial mental health problems dating back over thirty years, including evidence he had at one time suffered hallucinations and had received inpatient treatment at Dorothea Dix Hospital.  However, petitioner cannot show the MAR court's determination that petitioner was not prejudiced by counsel's failure to discover and present this evidence at trial is contrary

to, or an unreasonable application of, clearly established federal law or based upon an unreasonable determination of the facts. As the MAR court noted, Mr. Adams was only one of numerous eyewitnesses presented by the State at trial and Mr. Adams did not specifically identify petitioner as one of the men he saw. There is not a reasonable probability of a different outcome at trial had the jury been aware of his long-term serious mental health issues and low I.Q. scores.

As the MAR court recognized, there were no documented mental health issues in the period between the murders and trial, and Mr. Adams did not display any signs or symptoms suggesting to the attorneys that he was suffering from any such issues during that time period. Further, as the MAR court noted, Mr. Adams' account was in large part corroborated by the other eyewitnesses presented by the State at trial. Both Levi Snead and Brenda Nichols, who arrived on the scene as Mr. Adams was leaving, recall seeing three men beating a man on the ground with a fourth man with a flashlight in his hand walking toward Mr. Adams' vehicle. See St. Ct. Rec. Vol. 7 of 45 at 135; 152. These witness accounts bolster the credibility of Mr. Adams' testimony that four men were beating the victim, but then one man, who was holding a flashlight, left the group and approached his car causing Mr. Adams to drive away. The MAR court also noted that Mr. Adams' testimony and account remained consistent at the various trials of the co-perpetrators. Finally, when Mr. Adams' mental health issues became known prior to Chris Goode's trial, after considering his mental health issues, the

trial judge overseeing that case found Mr. Adams competent to proceed as a witness.

In light of all of these factors, and given the other evidence the State presented in support of petitioner's guilt, petitioner is unable to show the MAR court erred by finding he could not satisfy the prejudice prong of <u>Strickland</u>.[33] Petitioner is unable to show he is entitled to habeas relief on the basis of this argument.

E. <u>Claim IV.E</u>

In Claim IV.E, petitioner argues he received ineffective assistance of counsel at trial because his attorneys failed to present an expert to support petitioner's testimony he froze when he saw his brother and DeCastro attacking the Battens. Petitioner first raised this claim as Claim I.H in his MAR. The MAR court denied the claim on the merits finding petitioner was unable to satisfy either the performance or prejudice prong of <u>Strickland</u>. Dec. 2004 MAR order at 39. In reaching its ruling, the MAR court observed that even one of petitioner's trial attorney's expressed doubt about his explanation that he froze. <u>Id.</u> at 38. The MAR court reasoned that "any expert suggestion of Goode being 'frozen' would have been impeached by the evidence showing that Goode approached Mr. and Mrs. James Adams' vehicle in a threatening manner." <u>Id.</u> The MAR court also noted that counsel did obtain funding for a psychologist, Dr. Coleman. Dr. Coleman evaluated

---

[33] Having so found, the court need not address the finding with respect to the performance prong. <u>See</u> <u>Strickland</u>, 466 U.S. at 697.

Goode, but was not called as a witness at trial because counsel determined she could not provide any helpful information.  Id. at 39.

Petitioner argues the MAR court's ruling on this claim is based upon an unreasonable determination of the facts and is an unreasonable application of clearly established federal law. Petitioner attacks the MAR court's order insofar as it  does not mention testimony given by petitioner's expert called at the evidentiary hearing, Dr. Halleck.  Dr. Halleck, an expert in forensic psychiatry, testified explaining that it would not have been unusual for petitioner to freeze as he said he had and corroborated his opinion with other experts.  Petitioner argues that because the MAR court's order fails to make specific facts about Dr. Halleck's testimony, the court "refused to consider it."

Petitioner also argues the MAR court relied on evidence trial counsel did not believe petitioner when he said he "froze."[34] Petitioner argues this is an unreasonable finding in light of the evidence and cannot support the MAR court's finding because whether or not they had doubts, they proceeded with introducing the theory to the jury when petitioner testified at trial.

Finally, petitioner argues it was improper for the court to find counsel were not ineffective because they relied upon a

---

[34] In an early statement petitioner made to counsel, and inconsistent with his trial testimony, petitioner told counsel that after coming outside and seeing Mr. Batten on the ground he lifted Mr. Batten's head and dropped it and later, upon being ordered by DeCastro, he helped move the bodies into the back of the pickup truck.

psychological expert in preparing for trial. Petitioner asserts that although they consulted with Dr. Coleman generally, they did not consult with her or any expert on the specific issue of petitioner's reaction to the violence he observed.

At the evidentiary hearing on the MAR, Mr. Lytch testified the defense had obtained funds for a psychological expert at the time of trial. They had retained Dr. Coleman, a forensic psychologist. Mr. Lytch testified that Dr. Coleman interviewed petitioner and did some psychological testing. St. Ct. Rec. Vol. 23 of 45 at 619. Mr. Lytch testified that Dr. Coleman indicated she could not provide anything helpful and therefore, she was not called at either phase of trial. Id. When asked whether he had discussed with Dr. Coleman whether or not she could help with respect to the assertion that petitioner had panicked at the time the stabbing occurred, Mr. Lytch responded, "I am sure that we did. But in terms of me telling you specifically, I remember exactly what we talked about, I honestly cannot tell you that." Id. At the evidentiary hearing Mr. Denning testified that he had not spoken with Dr. Coleman at anytime, but had only spoken with Mr. Lytch about her findings. Id. at 683. He recalled that Mr. Lytch told him that Dr. Coleman indicated her evaluation of petitioner would not help the defense. Id. He indicated he could not recall specifically whether their purpose in seeking Dr. Coleman's evaluation was to support petitioner's theory that he panicked, but thought it was not. Id. at 683-84.

Petitioner is unable to show that the MAR court's ruling is

contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts. The court must judge the reasonableness of counsel's performance based upon the specific facts of the case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690. The information in the record shows that at the time of trial, counsel obtained help from an expert in forensic psychology to develop any expert testimony that could be helpful to the defense. Contrary to petitioner's assertion, the information in the record does not show that they did not consult with Dr. Coleman about petitioner's reaction to the violence.

Trial counsel acknowledged Dr. Coleman's primary purpose was to develop evidence on petitioner's mental health that could be useful at sentencing. See St. Ct. Rec. Vol. 23 of 45 at 619-20. However, Mr. Lytch, the attorney who had direct contact with Dr. Coleman, testified they were also looking for information that could be used at the guilt phase and he felt certain they had discussed petitioner's theory that he panicked during the attack. Id. at 620. Nonetheless, Dr. Coleman indicated she could not provide any helpful testimony and counsel ultimately determined Dr. Coleman should not be called to testify at either phase of trial. Petitioner cannot show that because during post-conviction proceedings a new expert, Dr. Halleck, offered a different opinion and concluded he could have presented useful information about petitioner's mental state, see St. Ct. Rec. Vol. 20 of 45 at 157-159, that counsel acted objectively unreasonably by relying on

their expert at the time of trial.[35]

As to petitioner's argument the court improperly failed to consider Dr. Halleck's testimony, he cannot show he is entitled to relief or *de novo* review on this basis. Merely because the MAR court's order does not specifically discuss Dr. Halleck, or his testimony, does not show the court did not consider the testimony in reaching its conclusion. In fact, in direct contradiction to petitioner's position, the order entered by the MAR court specifically states "[t]his court further considered all of the evidence and exhibits introduced at the evidentiary hearing held . . . in connection with the claims raised by Goode and the defenses raised by the State." Dec. 2004 MAR order at 2.

Finally, insofar as petitioner attacks the court's reasoning because the MAR court referred to the fact that trial counsel had doubts about whether he froze, petitioner is unable to show he is entitled to relief. As discussed above, the record supports the MAR court's determination that trial counsel consulted with an expert at the time of trial, and relying upon her opinion reasonably determined that a forensic psychiatrist or psychologist could not offer favorable testimony for their client at trial. Petitioner cannot show the MAR court's determination is unreasonable simply because the MAR court additionally observed in its discussion that "even one of Goode's own attorneys expressed

_____

[35] Having found that petitioner cannot succeed with respect to the MAR court's ruling on the performance prong of <u>Strickland</u>, the court need not address petitioner's arguments as to the prejudice prong. <u>See</u> <u>Strickland</u>, 466 U.S. at 697.

doubt about Goode's explanation that he was in shock at the murders." St. Ct. Rec. Vol. 40 of 45, Tab 3 at 38.

Accordingly, petitioner is unable to show the MAR court's ruling with respect to this claim is contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts.

For the reasons stated above, respondent's motion for summary judgment is denied as to Claim IV.B, but granted as to all other portions of Claim IV.

> 5. <u>Claim V - Petitioner received ineffective assistance of counsel at the penalty phase of trial because counsel failed to adequately investigate and present mitigating evidence</u>

In Claim V, petitioner argues he received ineffective assistance of counsel at trial because his attorneys failed to present information from four potential mitigation witnesses who were known to counsel, or could have reasonably been located by counsel, at the time of trial: Barbara Allen; Dr. W.B. Lewis; Lt. Thomas Langley; and Dr. Halleck. Petitioner argues these four witnesses could have provided compelling evidence.

Ms. Allen taught petitioner in the sixth grade and had a thirty-nine year teaching career. Petitioner states that she spoke with the defense team at the time of trial, but was not called as a witness. She described an incident in which petitioner was the only student who helped her when a heavy metal map fell on her during class. She described petitioner as popular, quiet, well-behaved, and never violent.

Dr. Lewis is the Senior Pastor at the church petitioner attended as a child and youth. Dr. Lewis maintained contact with petitioner after petitioner joined the Marines. Dr. Lewis expressed his opinion in a letter to trial counsel that petitioner was innocent and reliable. He never received a response to the letter and was not called at trial.

Lt. Thomas Langley worked in the jail where petitioner was in pretrial custody. Lt. Langley described petitioner as a model inmate. He was never contacted by a member of the defense team at the time of trial.

Dr. Halleck is the forensic psychiatrist who assisted Goode's defense team during post-conviction proceedings. Dr. Halleck offered expert testimony to help explain why petitioner would have failed to intervene and stop DeCastro and Chris Goode from murdering the Battens.

Petitioner first raised this argument in his MAR as Claim I.J and the claim was addressed at the evidentiary hearing before the MAR court. The MAR court denied the claim on the merits. The MAR court recognized that in preparing for trial, counsel or other members of the defense team spoke with members of petitioner's family, and other potential witnesses including former employers, teachers, family members, and friends. The MAR court noted that Mr. Ainley, who assisted the defense with investigation, gathered background information included in a social history. Dec. 2004 MAR Order at 39-40. The court recognized that at sentencing the defense called numerous witnesses including three family members, a former

employer, and a police officer. Id. The court found the witnesses who testified at trial related "the same or similar testimony as the witnesses whom Goode presented at the evidentiary hearing." Id. at 40. The MAR court concluded that given the investigation and interviews done by the defense, and in light of the case presented by the defense at sentencing, petitioner could not show he received ineffective assistance of counsel. Id.

Petitioner asserts the MAR court's ruling is unreasonable in light of the evidence presented. He contends the MAR court's findings are unreasonable insofar as the court found the testimony of the witnesses he now presents was similar to witnesses he presented at trial. He also attacks the MAR court's determination counsel were not deficient for failing to present these four witnesses because they made other efforts to develop and present mitigating evidence.

It is well established that defense counsel must "conduct a thorough investigation of the defendant's background" to identify potential mitigating evidence. Williams, 529 U.S. at 396-97. When a petitioner challenges the decision not to present certain mitigating evidence, the court must consider "whether the investigation supporting counsel's decision not to introduce [the evidence] . . . was itself reasonable." Wiggins, 539 U.S. at 521-23. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A particular decision not to investigate must be evaluated giving a "heavy measure of

deference to counsel's judgments."   Id.

The information before the court shows that trial counsel, with assistance from other members of the defense team, took reasonable steps to investigate and present mitigating evidence at trial.   Although counsel did not question every witness who petitioner now argues should have been called, the record reflects that counsel took reasonable steps to investigate and discover potential mitigating witnesses.   Counsel learn about petitioner's background, investigated his school years and military service, and spoke with family members, petitioner's estranged wife, and a pastor from his church.   Counsel considered a number of potential witnesses for sentencing whom had been interviewed by either counsel or one of the investigators.   St. Ct. Rec. Vol. 23 of 45 at 623, 626.

At sentencing, in addition to petitioner, the defense called: Mary Louise Pulley (petitioner's grandmother), Deborah Goode (petitioner's aunt), Aerial Privette (petitioner's aunt), Peggy Leonard (former employer), and Michael Chestnut (a Smithfield police officer in 1988).   These witnesses gave evidence that petitioner was a good employee who was friendly and helpful, a respectful, caring, and loving child and teenager.   Mr. Chestnut gave evidence that when he was working as a police officer he came in contact with petitioner who was working at a convenience store at the time and petitioner was respectful.

Petitioner cannot show that because trial counsel could have presented additional witnesses with evidence about his good

character and helpful nature that counsel were constitutionally deficient. Moreover, the court notes that Mr. Denning testified at the evidentiary hearing on the MAR that they had considered calling a jailer, but after personally talking to some of the jailers decided not to do so. See St. Ct. Rec. Vol. 23 of 45 at 703-04. Further, insofar as petitioner argues Dr. Halleck should have been called as a witness, he cannot show the MAR court erred in its ruling. At the time of trial, defense counsel consulted a forensic psychologist, Dr. Coleman, who indicated she could not give testimony helpful to the defense. Petitioner cannot show ineffective assistance of counsel because subsequent to trial his attorneys found a forensic psychologist with a differing opinion.

Accordingly, petitioner cannot show the MAR court's ruling is an unreasonable application of clearly established federal law or based upon an unreasonable determination of the facts. Respondent's motion for summary judgment is granted as to Claim V.

### 6. Claim VI - The trial court erred by ruling that evidence of DeCastro's criminal record was not relevant and admissible at sentencing

In Claim VI, petitioner argues the trial court erred by ruling he could not introduce evidence at sentencing of Eugene DeCastro's extensive criminal history of violent crimes. Petitioner argues the information would have shown the jury that he, with no criminal history, was less culpable and therefore, less deserving of the death penalty.

Petitioner first raised this argument on direct appeal and it was denied on the merits by the North Carolina Supreme Court.

<u>Goode</u>, 341 N.C. at 547-48, 461 S.E.2d at 651-52. The North Carolina Supreme Court reasoned that DeCastro's criminal history was not a circumstance of the offense or defendant's character and therefore, did not meet the definition of what was relevant as a mitigating circumstance. <u>Id.</u> at 548, 461 S.E.2d at 651.

Petitioner, citing to <u>Parker v. Dugger</u>, 498 U.S. 308 (1991) and <u>Lockett v. Ohio</u>, 438 U.S. 589 (1978), argues the state court's ruling that DeCastro's criminal history was irrelevant at sentencing was an unreasonable application of clearly established federal law.

Petitioner is unable to show he is entitled to relief on the basis of this claim. Federal law holds that in a capital case the jury must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett</u>, 438 U.S. at 604. However, DeCastro's criminal history is not a circumstance of the offense or an aspect of petitioner's character or record.

Furthermore, petitioner's reliance upon <u>Parker v. Dugger</u> is similarly misplaced. In <u>Parker</u>, the Supreme Court considered the constitutionality of a death sentence arising under Florida law. The Court concluded that because the Florida Supreme court incorrectly determined the trial court had not found any mitigating circumstances, thereby improperly applying Florida's sentencing procedure and denying Parker individualized sentencing treatment, Parker's death sentence had to be reconsidered in the state court.

<u>Parker</u>, 498 U.S. at 315-16. Nothing in <u>Parker</u> holds that a defendant is entitled as a matter of federal constitutional law to submit evidence of a co-defendant's criminal history. <u>Id.</u>

Consequently, petitioner cannot show the state court's ruling is contrary to, or an unreasonable application of, clearly established federal law. Respondent motion for summary judgment as to Claim VI is granted.

CONCLUSION

Respondent's motion for summary judgment is GRANTED in part and DENIED in part. For the reasons discussed above pursuant to Claim IV.B, the court finds petitioner received ineffective assistance of counsel in violation of his Sixth Amendment rights at the penalty phase of trial and has been sentenced to death in violation of his constitutional rights. A writ of habeas corpus vacating his death sentences shall issue, and the State of North Carolina shall sentence petitioner to life imprisonment on each count of first-degree murder unless, within 180 days, the State of North Carolina initiates new sentencing proceedings against Goode. As to all other arguments raised in Claim IV and all of the other claims raised in the petition, Goode fails to establish he is entitled to a writ of habeas corpus, and respondent's motion for summary judgment is GRANTED as to those claims.

This the 21st day of October 2009.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC